

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-1-2002

# USA v. Vega

Precedential or Non-Precedential:

Docket No. 00-5191

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Vega" (2002). *2002 Decisions.* Paper 233.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/233

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 1, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5191

UNITED STATES OF AMERICA

v.

CARLOS IGNACIO VEGA,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 99-cr-00131)
District Judge: Honorable Mary Little Cooper

Argued: February 6, 2001

Before: BECKER, Chief Judge, AMBRO and STAPLETON,
Circuit Judges

(Filed: April 1, 2002)

Michael A. Robbins, Esquire
 (Argued)
304 University Avenue
P.O. Box 863
Newark, NJ 07101

Counsel for Appellant


George S. Leone, Esquire
Elizabeth S. Ferguson, Esquire
 (Argued)
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Counsel for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge:

Carlos Vega appeals from his conviction for conspiracy to
distribute and possess with intent to distribute more than
one kilogram of heroin in violation of 21 U.S.C.SS 841(a)(1)
and 846. We decide three issues: (1) whether the District
Court abused its discretion when it admitted evidence of
Vega's participation in a prior drug conspiracy; (2) whether
the District Court clearly erred when it admitted into

evidence the contents of spiral notebooks taken from a prior drug conspiracy and conversations on the defendant's cellular phone as statements in furtherance of conspiracy; and (3) whether the District Court abused its discretion when it failed to dismiss a juror who admitted to feeling threatened by the conduct of a spectator at the trial but assured the Court that he could remain impartial. The District Court had subject matter jurisdiction pursuant to 18 U.S.C. S 3231. We exercise appellate jurisdiction under 28 U.S.C. S 1291. We find no error by the District Court.

I. Background Facts and Procedural History

On February 24, 1999, Carlos Vega was arrested when he picked up over two pounds of heroin from a woman named Lydia Miranda in a sting operation arranged by the Government. Miranda had been caught smuggling approximately one gram of heroin into the United States from Aruba on February 18, 1999. She was apprehended at Newark International Airport in Newark, New Jersey by United States Customs officials and arrested. She then agreed to cooperate with the Government by placing

recorded telephone calls to a person in Columbia named "Jairo," whom she claimed had hired her to transport the drugs. During one of these calls on February 23, 1999, Jairo instructed Miranda to call a telephone number and tell the person who answered that she was calling"on Jairo's behalf."

When Miranda made the call to the number provided by Jairo, a man answered and instructed her to call him again at a second number. When Miranda called the second number, the speaker identified himself as "Carlos" and told her that he had spoken to Jairo the night before. He arranged to meet Miranda at a McDonald's restaurant in Queens, New York the next day and described himself so that Miranda would be able to identify him. He also stated that he would meet her "on Jairo's behalf." The next day, Miranda went to the McDonald's and paged the the man at a number he had provided her. When the defendant, Carlos Vega, arrived, he called Miranda and told her he was outside McDonald's. Miranda then met Vega outside. He asked her to get into his car and, when she began to comply, they were both arrested.

At the time of arrest, Vega had on him a piece of paper that stated "Jairo de parte de," which means"on behalf of Jairo." The paper also referenced Miranda's pager number and the number of pellets of heroin that she carried. Officers found money remittance forms in Vega's car with the name Harold Carbajal on them. Vega told the officers that his nickname was Nacho, and that he had come to meet Miranda because a mutual friend named Alejandro had told him that Miranda needed plumbing work done in her apartment which he could provide.

After Vega was arrested, he gave law enforcement officers permission to answer his cellular phone. Special Agent Velez intercepted five telephone calls. He later testified before the jury that the same caller, a Spanish-speaking male, made the first four calls. Each time the caller asked to speak with Vega, and Velez answered that Vega was unavailable because he was fixing his car. Velez further testified that the fifth call he intercepted was made by a different man, whom Velez recognized as Jairo based on voice identification from previously recorded calls between

Miranda and Jairo. In that call, Jairo threatened Vega and stated, "it's best if he turned over what he had."

Vega was charged with conspiracy to distribute and possession with intent to distribute more than one kilogram of heroin in violation of 21 U.S.C. SS 841(a)(1) and 846. At trial, the Court was informed that Juror # 7 had felt uncomfortable because someone in the back of the courtroom was staring at him. Judge Cooper then conducted a voir dire of Juror # 7 in order to determine whether he would be able to continue as an impartial witness and whether he had communicated his concerns to any other jurors. This voir dire occurred while the jury was out of the courtroom on a lunch break.

During the voir dire, Juror # 7 stated that he had noticed that a man in the gallery was watching him very intently when he was watching Vega during a playback of one of the recorded tapes. He explained that when he had leaned forward to avoid the man's gaze, the man in the gallery had moved to keep eye contact with him. He told Judge Cooper: "My impression was I was uncomfortable and that someone was paying attention to me specifically." Judge Cooper instructed Juror # 7 that the particular individual who had been staring at him would be asked to leave the courtroom thereafter, and that all family members of Vega would be told that they were not to engage in any eye contact with any juror.

During the voir dire, Judge Cooper also permitted defense counsel to question Juror # 7 about his ability to continue as an impartial juror. In response, Juror # 7 stated that the reason he had raised the issue to the Court was that he had heard stories of retaliation in drug cases and he felt uncomfortable as a result of the staring. However, he declined an offer to be escorted to his car from the courthouse for the remainder of the trial. He also responded that he would be able to continue as a fair and impartial juror because he knew the Court was "aware of the situation."

Juror # 7 was permitted to continue as a juror. Upon returning to the courtroom, the other jurors were informed that Juror # 7 had been in the courtroom without them for

reasons unrelated to the evidence in Vega's case. As it turns out, the spectator who had been staring at Juror # 7 was Vega's brother, but the Court did not inform Juror # 7 of this fact.

Later during the trial, the Government sought to admit evidence of Vega's participation in a drug conspiracy in 1997. The evidence consisted of documents handed over to law enforcement officers by one of the co-conspirators in the 1997 conspiracy. It also included the testimony of three witnesses -- Steve O. Lee, a U.S. Customs official, Domingo Garcia, a postal inspector, and Detective David Kosloske of the Miami-Dade Police Department -- about the circumstances under which these documents were in the Government's hands.

Lee testified that a packaged computer monitor containing heroin had been intercepted at the foreign mail facility in Miami, Florida in September 1997. Garcia testified that he obtained a warrant permitting him to install a beeper into the package and that he called Detective Kosloske at the Dade County Detective Office to make plans to attempt a controlled delivery of the package in order to determine the participants in the sending and receiving of the package. Garcia and Kosloske set up surveillance to apprehend any individual who accepted delivery of the package. They witnessed a young woman, named Maria Arocha, pick up the package and get into a green Honda driven by Vega. They followed the vehicle to the apartment complex where Arocha and Vega were detained and questioned.

Kosloske testified that Arocha gave him spiral notebooks that reflected "expenses related to the narcotic organization she was working for." These notebooks contained frequent references to the name "Harol Alfredo Carbajal," whom the Government alleges is the same person referred to as "Jairo" in this case. They also mentioned Vega, and his nickname, Nacho. Finally, among the documents handed over by Arocha was a bill of sale for a green Honda that was signed by Vega and made out to a person named Jose Hernandez, whose name also appeared in the spiral notebooks.

Vega was never charged with participation in the 1997 conspiracy in part because he told officers that he was unaware of the contents of the package picked up by Arocha. Nevertheless, the above testimony regarding Vega's participation in the 1997 drug conspiracy, photocopies of pages from the spiral notebooks provided by Arocha, and the bill of sale for the green Honda were admitted into evidence against Vega to demonstrate his knowledge of a drug conspiracy, and his relationship with one of its members, when he was apprehended receiving heroin from Miranda on February 24, 1999.

The jury found Vega guilty of the 1999 drug conspiracy charge. Vega, in anticipation of his sentencing, met with the Government for a proffer in the effort to comply with U.S.S.G. S 5C1.2, which for drug-related offenses provides in certain instances an exception (or "safety valve") to a mandatory minimum sentence. Based on the belief that Vega truthfully provided all information he had concerning the offense charged as part of a common scheme, he received a two level downward adjustment. Vega also received a two level downward adjustment pursuant to U.S.S.G. S 3B1.2(b) for his minor role in the offense. His final offense level was 28, criminal history category I, which resulted in a sentencing range of 78 to 97 months. The District Court sentenced him to 78 months imprisonment, five years supervised release, a $500 fine and a special assessment of $100. Thereafter, Vega filed a timely appeal.

Vega challenges his conviction on three grounds. First, he alleges that the District Court improperly admitted evidence from the 1997 drug conspiracy that should have been excluded under Federal Rule of Evidence 404(b). Second, he challenges the District Court's decision to admit the spiral notebooks received from Arocha's apartment, and the cellular phone conversations intercepted by Special Agent Velez, as evidence in furtherance of conspiracy under Federal Rule of Evidence 801(d)(2)(E). Finally, Vega maintains that the District Court erred by failing to dismiss Juror #7 after he admitted that he felt threatened by a spectator at the trial.

6

## II. Exclusion Under Rule 404(b)

Vega argues that the District Court abused its discretion by admitting evidence from the 1997 drug conspiracy that should have been excluded under Federal Rule of Evidence 404(b). The evidence that Vega complains of includes testimony by the Government's witnesses regarding his participation in the 1997 drug conspiracy, photocopies of pages from the spiral notebooks provided by Arocha, and the bill of sale for the green Honda taken from Arocha's apartment.

Four guidelines given by the Supreme Court govern the admission of prior "bad acts": (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its potential for unfair prejudicial effect under Rule 403; and (4) the Court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. Huddleston v. United States, 485 U.S. 681, 691-92 (1988); United States v. Console, 13 F.3d 641, 659 (3d Cir. 1993); Government of Virgin Islands v. Edwards, 903 F.2d 267, 270 (3d Cir. 1990). Vega argues that the Government's evidence from the 1997 conspiracy was not introduced for a proper purpose under Rule 404(b) and was irrelevant under Rule 402. He also contends that this evidence should

have been excluded under Rule 403 because its prejudicial effect substantially outweighed its probative value. We disagree.

The District Court determined that the evidence was proffered for two permissible purposes: (1) to demonstrate Vega's knowledge of the 1999 drug conspiracy, and (2) to show his relationship with a member of the 1999 drug conspiracy named Jairo. Evidence of prior bad acts may be admitted for the purpose of demonstrating the defendant's knowledge in the later offense with which he is charged. See Console, 13 F.3d at 659 (evidence that the defendants had previously received and submitted fraudulent bills from other doctors was admissible for the purpose of demonstrating the defendants' knowing receipt of fraudulent bills). An additional unenumerated yet permissible purpose for admitting evidence under Rule 404(b) is to "demonstrate a continuing relationship between

an unindicted co-conspirator and the defendant . . .." United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir. 1988); see also United States v. O'Leary, 739 F.2d 135, 136 (3d Cir. 1984) (evidence properly admitted to show, inter alia, the parties' familiarity with one another, and their coordinated action). Thus prior bad act evidence may be admitted for the purpose of demonstrating Vega's knowledge of a conspiracy and relationship with one of its members.1

Vega contends that the evidence should have been excluded nonetheless because it is not relevant to demonstrate his knowledge and relationship with a member of the 1999 conspiracy. He directs our attention to the fact that he never opened the package containing drugs in 1997 and was never arrested nor charged with any crime related to the 1997 drug transaction.

However, Rule 404(b) applies to "evidence of other crimes, wrongs, or acts," not just charged crimes or convictions. It does not require that a defendant's participation in the prior bad act be proven by conviction. Indeed, we have previously found prior bad acts of defendants relevant without any indication that they had been charged with or convicted of crimes stemming from those acts. See, e.g., Console, 13 F.3d at 659 (evidence that defendants received and submitted fraudulent bills from other doctors was relevant toward demonstrating that the defendants knew the bills were fraudulent); see also United States v. Atwell, 766 F.2d 416, 421 (10th Cir. 1985) (testimony that various suppliers had previously paid the defendant kickbacks was admissible for purposes of demonstrating that the

_____

1. Although not a ground for decision in the District Court, we note that the evidence from the 1997 conspiracy could also have been proffered for the purpose of demonstrating that Vega had the opportunity and/or intent to participate in the 1999 conspiracy. See, e.g., United States v.

Zolicoffer, 869 F.2d 771, 773 (3d Cir. 1989) (evidence of prior drug transactions properly admitted to show that defendant had access to drugs and was willing and hoping to engage in a large scale drug transaction); United States v. Echeverri, 854 F.2d 638, 644 (3d Cir. 1988) (evidence of prior drug transaction properly admitted to show that defendant had access to large quantities of cocaine and was preparing to establish a large scale drug business).

defendant had intended and planned a later kickback scheme).

Moreover, the Supreme Court has explained that evidence of a similar prior bad act "is relevant . . . if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Huddleston , 485 U.S. at 689. It expressly opted for this lower standard of proof instead of the more rigid preponderance of evidence or clearly convincing evidence standards. See id. at 687 n.5, 689.

In this case, Arocha admitted there was a drug conspiracy in 1997 and turned over documents (including spiral notebooks) that she claimed contained "expenses related to the narcotic organization she was working for." It also referred to Vega and his nickname, Nacho. Among the documents provided by Arocha was a bill of sale for the green Honda that connected Vega to Jose Hernandez, who was also mentioned in the spiral notebooks. Finally, the Government's witnesses testified that they observed Arocha get into a green Honda driven by Vega after picking up the heroin package at the foreign mail facility in Miami. Vega was thus connected to the green Honda described in the bill of sale and to Jose Hernandez, who was listed in the spiral notebooks allegedly documenting transactions in the 1997 drug conspiracy. Based on this evidence, a jury could reasonably conclude that the alleged 1997 drug conspiracy occurred, and that Vega was a participant in it. See Huddleston, 485 U.S. at 689. Moreover, the jury could infer from Vega's involvement in the prior drug conspiracy that he did not unwittingly participate in the drug transaction with Arocha in 1999, and that he had a relationship with Jairo, who participated in both conspiracies. The Government's evidence was therefore relevant to show Vega's knowledge of, and relationship with a member of, the 1999 conspiracy.

United States v. Garcia-Orozco, 997 F.2d 1302 (9th Cir. 1993), does not persuade us otherwise. In that case, the Ninth Circuit reviewed whether evidence of the defendant's prior arrest for possession with intent to distribute heroin was relevant to show that he later knowingly imported 120 pounds of marijuana into the United States from Mexico.

Id. at 1304. The Court believed that the evidence was not

logically relevant to demonstrate knowledge because it was "unreasonable to expect that the 1988 incident would have put Garcia-Orozco on 'notice' that every car in which he rode thereafter could contain drugs." Id.

However, the Government's case against Vega does not rely on the inference that a defendant who has been"once burned is twice shy," as it did in Garcia-Orozco.2 Put differently, it does not attempt to demonstrate the defendant's knowing possession by referring back to an earlier possession offense. Rather, the Government argues, and we agree, that evidence of Vega's participation in a prior drug conspiracy is probative of his knowledge of, and relationship with a member of, a later drug conspiracy.

We also find no error in the District Court's finding that the probative value of this evidence outweighed its potential for unfair prejudicial effect. See, e.g., United States v. Palma-Ruedas, 121 F.3d 841, 852 (3d Cir. 1997), rev'd on other grounds by 526 U.S. 275 (1999); United States v. Echeverri, 854 F.2d 638, 644 (3d Cir. 1988). We have previously cautioned that " '[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal'." Scarfo , 850 F.2d at 1019 (quoting United States v. Long, 574 F.2d 761, 767 (3d Cir. 1978)).

In this case, the Government's evidence of Vega's participation in the 1997 drug conspiracy was of critical importance because Vega had denied knowledge of the 1999 conspiracy and alleged that he met Miranda merely to provide plumbing services. The evidence was highly probative in demonstrating that Vega knew he was receiving a drug package from Miranda and that he was connected to Jairo, who was a participant in both the 1997 and 1999 conspiracies. Although the evidence undoubtedly

_____

2. "Once burned, twice shy" is a colloquial phrase used by the First Circuit in United States v. Aguilar-Aranceta, 58 F.3d 796 (1st Cir. 1995), to describe the inference that someone who has been previously convicted of receiving packages with drugs would be unlikely to accept, innocently and unwittingly, mysterious packages a second time for fear that they might contain drugs. See id. at 801.

10

had some prejudicial value, we cannot say that the Court abused its discretion by concluding that this prejudicial value was not so unfair as to outweigh its probative value when we compare this case with cases like Palma-Ruedas and Echeverri, where evidence of the defendant's participation in a prior drug transaction involving fourteen kilograms of cocaine, and a prior drug transaction involving five grams of cocaine, was admissible despite its prejudicial effect. Palma-Ruedas, 121 F.3d at 852; Echeverri, 854 F.2d at 643-44.

The First Circuit's decision in United States v. Aguilar-

Aranceta, 58 F.3d 796 (1st Cir. 1995), does not persuade us otherwise. In that case, the Court expressed concern that the probative value of the defendant's prior drug conviction was low because the prior conviction was remote in time (four years old). The prior bad act evidence also had low probative value because it did not appear that the defendant's prior conviction would have prevented her from accepting drugs unknowingly a second time. See id. at 801-02. Instead it appeared that the defendant's inability to speak English had led her to rely unwittingly even a second time upon a window clerk who insisted that she accept the package later determined to contain drugs.

Unlike the defendant in Aguilar-Aranceta, Vega was not charged with mere possession of drugs. He was charged with participation in a drug conspiracy. The Government did not try to demonstrate the defendant's knowing possession of drugs by admitting evidence of a prior possession offense, as was done in Aguilar-Aranceta. As already noted, the Government admitted evidence of Vega's involvement in a prior drug conspiracy in order to demonstrate his knowledge of a later drug conspiracy and his relationship with one of its members.

Finally, we observe that the District Court gave a proper limiting instruction making it especially clear that the 1997 evidence should be considered only insofar as it shows Vega's knowledge of the 1999 drug conspiracy and acquaintance with one or more of its members. The Court repeatedly emphasized that the evidence could not be used to demonstrate defendant's bad character or propensity to commit crimes as required before admitting prior bad act

11

evidence before the jury. See Huddleston, 485 U.S. at 691; Palma-Ruedas, 121 F.3d at 852 n.11; Echeverri, 854 F.2d at 644; O'Leary, 739 F.2d at 137. We find no error in this instruction and Vega does not appear to challenge it on appeal. We also observe that the limiting instruction provided by the District Court mitigated the potential prejudice against Vega, thereby reinforcing our belief that the Court did not err in its balancing under Rule 403. See Palma-Ruedas, 121 F.3d at 852; Echeverri, 854 F.2d at 644.

In summary, we believe that the evidence from the 1997 conspiracy was admitted for, and relevant toward, demonstrating two permissible purposes: Vega's knowledge of the 1999 conspiracy and his relationship with a member of that conspiracy. We further believe the District Court did not abuse its discretion by concluding that the probative value of this evidence outweighed its potential unfair prejudicial effect, especially where a lengthy limiting instruction was given. We therefore find no reason to conclude that this evidence should have been kept from the jury.

III. Statements In Furtherance Of Conspiracy Under Rule 801(d)(2)(E)

Vega argues that the District Court clearly erred when it admitted into evidence (1) the spiral notebooks received from Arocha, and (2) conversations intercepted by Special Agent Velez on Vega's cellular phone, as statements in furtherance of conspiracy under Rule 801(d)(2)(E). The District Court was required to make the following findings before admitting evidence under that Rule: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) it was made in furtherance of the conspiracy. United States v. Ellis, 156 F.3d 493, 496 (3d Cir. 1998); United States v. McGlory, 968 F.2d 309, 333 (3d Cir. 1992) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). These findings must be supported by a preponderance of the evidence and are reviewed for clear error. Ellis , 156 F.3d at 496. Vega argues that the District Court improperly admitted the spiral notebooks and the cellular phone

12

conversations because there was insufficient evidence demonstrating the existence of drug conspiracies in 1997 and 1999, respectively.

When determining whether there is sufficient evidence of a conspiracy's existence, the District Court should consider the independent evidence in the record combined with the hearsay statements themselves. Rule 801(d)(2) provides that "[t]he contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered. . . ." Fed. R. Evid. 801(d)(2). An Advisory Committee Note further explains that the District Court "must consider in addition the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question." Fed. R. Evid. 801 advisory committee's note, 1997 amendment.

Vega's name and nickname, along with the names of Maria Arocha, Harol Carbajal, and Jose Hernandez, appeared in the spiral notebooks taken from Arocha's apartment in 1997. In addition, the Government presented the following independent evidence of a 1997 conspiracy. Arocha told the officers that there was a conspiracy, that she was part of it, and that the spiral notebooks contained records kept by her. Also among the papers provided by Arocha was a bill of sale for a green Honda signed by Vega and made out to Jose Hernandez. Moreover, Vega drove Arocha from the location where she picked up the drug package to her apartment in a green Honda. We cannot say that the District Court clearly erred in finding that this evidence demonstrated the existence of a conspiracy in 1997.

The record also contains evidence sufficient to support the Court's finding that a conspiracy existed in 1999. Miranda had a piece of paper with the name "Jairo" on it when she was first detained entering the United States from Colombia. The telephone calls Miranda then made to Jairo provided the link that there was a conspiracy between them. Jairo gave Miranda a phone number through which

13

she communicated with Vega and made plans to meet him. When Vega was arrested he had a piece of paper in his pocket with the phrase, "on behalf of Jairo," Miranda's pager number, and the number 142, which corresponded to the number of drug pellets she was carrying. Vega did not question Miranda when she asked to be paid and mentioned Colombia. Vega had a money transfer order in his car made out to "Harold Carbajal," and the names "Jairo" and "Harold" were used interchangeably when Miranda made recorded phone calls in an attempt to reach Jairo in Colombia.

In short, we believe there was sufficient evidence to support the existence of both the 1997 and 1999 conspiracies. We therefore affirm the Court's decision to admit the spiral notebooks and cellular phone conversations into evidence under Rule 801(d)(2)(E) as statements in furtherance of the 1997 and 1999 conspiracies, respectively.

IV. Improper Communication With Juror

Vega argues that the District Court erred by failing to dismiss Juror # 7 after he admitted that he felt threatened by a spectator to the trial. The Government responds that no error occurred because the District Court properly conducted a voir dire of Juror # 7 through which it determined that he could continue as an impartial juror and that no other jurors had been improperly influenced.

We review the District Court's decision for abuse of discretion. Government of the Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir. 1985). The issue to decide on appeal is whether Vega suffered substantial prejudice from the improper juror communication. United States v. Gilsenan, 949 F.2d 90, 95 (3d Cir. 1991). "We make this determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." Id; accord Waldorf v. Shuta, 3 F.3d 705, 710 (3d Cir. 1993).

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . .

14

deemed presumptively prejudicial, if not made in pursuance

of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." Remmer v. United States, 347 U.S. 227, 229 (1954); accord United States v. Console, 13 F.3d 641, 666 (3d Cir. 1993) (holding that presumption of prejudice applies when there is third-party communication with a juror regarding the matter pending before the jury). However, this presumption of prejudice is not conclusive. See Remmer, 347 U.S. at 229. Rather, the District Court should hold a hearing in the presence of the defendant at which the Government has the burden to prove that the improper communication did not and will not prejudice the defendant. See id. at 229-30. Although the method of conducting voir dire during the hearing to determine prejudice is left to the sound discretion of the District Court, see Console, 13 F.3d at 667, it must conduct a voir dire of all jurors with whom the improper communication occurred that is sufficiently tailored to probe adequately the possibility of prejudice. Waldorf, 3 F.3d at 710; Console, 13 F.3d at 667.

In Waldorf, the jurors had been exposed to newspaper articles and other media that revealed inadmissible evidence. The District Court conducted a voir dire of certain jurors who admitted they had heard or seen the information from the media, but the Court failed to do a "searching inquiry into the extent and nature of the prejudicial extrajudicial information that reached the jurors so as to ascertain for itself whether there was a substantial likelihood of prejudice . . . ." 3 F.3d at 713. We therefore remanded for a new trial. See id. In Console, the District Court conducted an individual in camera voir dire of each juror potentially affected by the improper communication and on the basis of the voir dire concluded that the defendant was not prejudiced. 13 F.3d at 667. We specifically contrasted the thoroughness of the voir dire in Console with the insufficient voir dire in Waldorf that "failed to ask voir dire questions 'designed to elicit answers which provide an objective basis for the court's evaluation,' and failed to voir dire three of eight jurors individually." Console, 13 F.3d at 667 (quoting Waldorf, 3 F.3d at 712).

15

In this case, we find no abuse of discretion because the District Court conducted a sufficiently thorough voir dire and determined that there would be no prejudice to Vega resulting from the improper communication with Juror # 7. Upon learning that Juror # 7 had concerns about improper communication from a member of the trial audience, the District Court held a hearing before counsel and out of the presence of the rest of the jury. During the voir dire, Juror # 7 stated: "My impression was I was uncomfortable and that someone was paying attention to me specifically." He also stated that the reason he had raised the issue to the Court was that he had heard stories of retaliation in drug cases and he felt uncomfortable about being stared down. However, he also explained that he believed he would be able to continue as a fair and impartial juror because he

knew the Court was "aware of the situation."

We note that where there is a substantial possibility of prejudice, "the voir dire must not simply call for the jurors' subjective assessments of their own impartiality." Waldorf, 3 F.3d at 710. However, there is sufficient evidence apart from Juror # 7's own subjective assessment to support the District Court's conclusion that he could remain impartial for the remainder of the trial. For example, during the voir dire, Juror # 7 declined an offer to provide him with an escort to his car from the courthouse. This conduct conveyed that his level of fear was mild and supported his subjective assessment that he could remain impartial for the remainder of the trial. The District Court concluded that Juror # 7's concerns could be abated by an instruction that the particular individual who had been staring at him would be asked to leave the courtroom during the remainder of the trial, and that all family members of Vega would be told that they were not to engage in any eye contact with any juror. We see no reason to find that this was an abuse of discretion.

In addition, it was determined at the hearing that Juror # 7 had not voiced his concerns to any other jurors. After the voir dire, the jury was instructed upon returning to the courtroom that Juror # 7 had been in the courtroom for reasons unrelated to the evidence in the case and that the jury was not to speculate on what happened while the jury

16

was kept waiting. Thus, the improper communication had been limited to Juror # 7 and the remainder of the jury was unaffected.

Finally, we cannot resist commenting on the obvious but unspoken incongruity we would foist on the Government were we to allow Vega to escape conviction due to the acts of his brother. One would think that the only party that stood to suffer from this improper communication was the Government because Juror # 7 might have been unwilling to return a verdict of guilty if he feared retaliation from Vega's brother. The fact that the jury convicted Vega is further evidence that Juror # 7 was not improperly influenced by the improper communication. In this context, and for the reasons discussed above, we believe the Government met its burden of demonstrating that Vega suffered no prejudice from the improper communication. The District Court therefore did not abuse its discretion by failing to dismiss Juror # 7.

V. Conclusion

We conclude that the District Court did not abuse its discretion when it admitted evidence from the 1997 conspiracy. That evidence was admitted for the proper purpose of, and was relevant to, demonstrating Vega's knowledge of the 1999 conspiracy and his relationship with one of its members. Moreover, the probative value of the

evidence was not outweighed by its potential unfair prejudicial effect, especially when the District Court took great care to provide a lengthy limiting instruction to the jury.

We also conclude that the District Court did not clearly err when it admitted into evidence statements from the spiral notebooks taken from Arocha's apartment, and conversations intercepted on Vega's cellular phone, as statements in furtherance of conspiracy under Rule 801(d)(2)(E). We cannot say that the independent evidence in the record combined with the hearsay statements themselves clearly failed to support the existence of both the 1997 and 1999 conspiracies.

17

Finally, we conclude that the District Court did not abuse its discretion by failing to dismiss Juror # 7 after he expressed concerns about improper communication from a spectator to the trial who turned out to be the defendant's brother. The District Court properly conducted a thorough voir dire of the juror and determined that Vega would suffer no prejudice from the communication because the juror was able to proceed as an impartial witness and no other jurors had been improperly influenced.

For these reasons, we affirm Vega's conviction.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

18