

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-17-2007

# USA v. Keyes

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1684

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Keyes" (2007). *2007 Decisions.* Paper 1767.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1767

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 05-1684, 05-1859, 05-1920, & 05-1938

———

UNITED STATES OF AMERICA

v.

ANDRE KEYES, Appellant in No. 05-1684,
FERNANDO PENA, Appellant in No. 05-1859,
CALVIN GOODRICH, Appellant in No. 05-1920, &
ANGEL CASTILLO-BIENVENIDO, JR., Appellant in No. 05-1938,

Appellants

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Nos. 03-cr-487-03, -09, -11, -01)
The Honorable John R. Padova, District Judge

———

Submitted under Third Circuit LAR 34.1(a)
March 10, 2006

Before: ALDISERT and ROTH*, Senior Circuit Judges
RODRIGUEZ**, District Judge

(Filed:   January 17, 2007)

———

*The Honorable Jane R. Roth assumed senior status on May 31, 2006.

** The Honorable Joseph H. Rodriguez, Senior United States District Judge for the District of New Jersey, sitting by designation.

## OPINION OF THE COURT

**RODRIGUEZ**, <u>District Judge</u>.

In consolidated appeals, Appellants, Andre Keyes, Fernando Peña, Calvin Goodrich, and Angel Castillo-Bienvenido, Jr., appeal their convictions and sentences entered in the Eastern District of Pennsylvania after they were found guilty of conspiracy to sell crack cocaine in Reading, Pennsylvania from January 2002 through October 2003.

Keyes based his appeal on the argument that the Government did not prove beyond a reasonable doubt that he was part of a single conspiracy to distribute drugs; instead, he argues, the evidence showed there were distinct and multiple conspiracies at work. He also argues that the district court improperly allowed the Government to reopen its case and introduce a new document never shared with defense counsel until after the Government failed to introduce evidence sufficient to sustain three charges against Keyes.

Peña has argued that the evidence at trial showed he was a competitor, rather than a member of the drug dealing conspiracy charged in this case. He also asserts that the sentencing court should not have permitted the Government to call new witnesses at his sentencing in order to enhance his guideline calculation with facts that had not been proven to a jury; Peña was sentenced to 260 months of incarceration.

Goodrich seeks review of one issue: whether the district court abused its discretion in admitting into evidence testimony regarding cell phone records, the identities of the

2

recipients of cell phone calls, and the identities of cell phone number owners. Goodrich argues that such evidence was hearsay.

Similarly, Castillo-Bienvenido argues that the district court erred in failing to exclude as hearsay the testimony of, and written charts and graphs created by, law enforcement officers regarding cell phone records because no custodian of the records or other qualified witness authenticated the records or explained how they were compiled and kept. Castillo-Bienvenido also contends that he was unfairly prejudiced by the admission of testimony that he held a loaded gun to a man's back on a public street and wrestled with the man for control of the gun, when he was not charged with a firearms offense and the incident was not shown to be related to the charges against him.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Because we write solely for the parties, we will only mention those facts relevant to our analysis. On October 28, 2003, a Grand Jury in the Eastern District of Pennsylvania returned a Superseding Indictment against Defendant-Appellants Andre Keyes, Fernando Peña, Calvin Goodrich, Angel Castillo-Bienvenido, and nine co-defendants. Keyes, Peña, Goodrich, and Castillo-Bienvenido were charged with conspiracy to distribute in excess of fifty grams of cocaine base in violation of 21 U.S.C. § 846 (Count One); Keyes, Goodrich, and Castillo-Bienvenido were charged with possession with intent to distribute in excess of five grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2 (Count Ten and Count Nineteen) and possession with intent to distribute in excess of five grams of cocaine base within 1,000 feet of a school in violation of 21 U.S.C. § 860(a) and

3

18 U.S.C. § 2 (Count Eleven and Count Twenty). In addition, Keyes was charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2 and employing a juvenile to distribute crack in violation of 21 U.S.C. § 861(a)(1) and 18 U.S.C. § 2. On or about February 18, 2004, following a six-day jury trial, Keyes, Peña, Goodrich, and Castillo-Bienvenido were convicted of all charged counts.

## JURISDICTION

This Court has jurisdiction to review the final judgments of the district court under 28 U.S.C. § 1291; we also have jurisdiction over these appeals pursuant to 18 U.S.C. § 3742.

## DISCUSSION

### Single versus Multiple Conspiracies

The issue of whether a single conspiracy or multiple conspiracies exists is a fact question to be decided by a jury. United States v. Curran, 20 F.3d 560, 572 (3d Cir. 1994). Keyes has argued that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he was guilty of a single conspiracy to distribute drugs. Specifically, Keyes contends that many of the alleged drug houses run by the "Tenth Street Gang" were actually independently operated and kept so under threat of violence. To support this contention, Keyes points to the testimony of Miguel Acevedo-Hernandez, Andrew Anthony Cruz, Jessica Almodovar, and Kenneth Willams. In addition, Keyes has argued that there were multiple conspiracies because "different people were caught at different places doing

4

their own different operations."

Similarly, Peña has argued that the evidence failed to demonstrate that he was a member of the charged conspiracy. Instead, he contends, he was a competitor. He has appealed the denial of his motion for acquittal, but acknowledges that a reviewing court will overturn a jury verdict only when the record contains no evidence, regardless of how it is weighted, from which a jury could find guilt beyond a reasonable doubt. United States v. Thayer, 210 F.3d 214, 218-19 (3d Cir. 1999).

The standard of review for sufficiency of the evidence claims is a deferential standard. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (citing United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996)). This inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Instead, the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.

The essence of a conspiracy is an agreement. United States v. Kelly, 892 F.3d 255, 258-59 (3d Cir. 1989) (citing United States v Nolan, 718 F.2d 589, 595 (3d Cir. 1983)). The government need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act. Id. at 259. The essential elements of conspiracy are 1) whether there was a common goal among the conspirators, 2) whether the agreement contemplated bringing to pass a continuous result that would not continue without the continuous cooperation of the co-conspirators, and 3) the

5

extent to which the participants overlap in the various dealings.  <u>Kelly</u>, 892 F.2d at 259; <u>but see</u> <u>United States v. Padilla</u>, 982 F.2d 110, 115 (3d Cir. 1992) ("we note that the <u>Kelly</u> factors are most useful to show the existence of a single conspiracy, but that the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy").

In <u>Kelly</u>, the defendant was convicted of conspiracy to import and distribute P2P and to manufacture and distribute methamphetamine.  <u>Id.</u> at 256-57.  The defendant argued on appeal that he was unfairly prejudiced by a variance between the single conspiracy charged in the indictment and evidence at trial, which he claimed proved several conspiracies.  <u>Id.</u> at 258.  This Court affirmed the conviction and reasoned that 1) the common goal was to make money from selling drugs, 2) the success of one group was necessary for the success of another group because the nature of the scheme required cooperation to provide a steady supply of P2P, and 3) the government need not prove that each defendant knew all the details, goals, or other participants in order to find a single conspiracy. <u>Id.</u>

Although multiple conspiracies are "separate networks operating independently of each other," the relatedness of the activities of the co-conspirators in support of the overall illegal scheme can defeat a claim of multiple conspiracies.  <u>United States v. Perez</u>, 280 F.3d 318, 346 (3d Cir. 2002) (citing <u>United States v. Barr</u>, 963 F.2d 641, 648 (3d Cir. 1992)).  In <u>Perez</u>, the defendant was convicted of conspiring to distribute and to possess with intent to distribute methamphetamine. <u>Id.</u> at 326.  The defendant contended that the conviction should be overturned because there was not specific knowledge of an interdependency among the various factions. <u>Id.</u> at 347.  This Court disagreed and affirmed the conviction. We reasoned that a party did not have to know all the details and goals of all the participants to constitute a single conspiracy, the party only had to be aware that he or she was a part of a larger drug

6

operation.  Id.

Further, disputes between participants do not necessarily fracture a single conspiracy. Kelly, 892 F.2d at 260 (citing United States v. DeVarona, 872 F.2d 114, 120 (5th Cir. 1989)). In Kelly, the common catalyst of the disputes between defendants was greed; no party wanted to be left out of the operation.  Id.  Therefore, the court reasoned that there were not multiple conspiracies operating against one another solely because there were disputes between the defendants.  Id.

Finally, this Court has recognized, "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." United States v. Price, 13 F.3d 711, 728 (3d Cir. 1994).

The government's theory in this case was that the members of the Tenth Street Gang conspired to maintain control over their area with guns, threatening and using violence, and wearing bullet-proof vests.  The evidence showed that Miguel Acevedo-Hernandez and Manuel Perez controlled the drug trafficking in the area of 10th and Franklin Streets and dictated who was permitted to sell in that area.

We find that a trier of fact could have concluded beyond a reasonable doubt that Keyes was a part of a single conspiracy because he was a seller for the drug network of distributor Acevedo-Hernandez.  For example, Andrew Cruz testified that in approximately November 2002, he began delivering crack for Miguel Acevedo-Hernandez in the vicinity of 10th and Frankin Streets.  Keyes App. IV 934-38. He further testified that he delivered crack from Miguel Acevedo-Hernandez to Keyes at 280 South 9th Street on two separate occasions.  Keyes App. IV 936-37.  Miguel Acevedo-Hernandez admitted supplying Cruz

7

with drugs which Cruz distributed to sellers in the area, including Keyes. Keyes App. V 1040-42. He also stated that the drug business was limited to certain approved dealers and that if someone else tried to sell in the neighborhood, "they would have problems." Keyes App. V 1053. Among the people permitted to sell in the area were Keyes, Goodrich, Mustafa Sheriff, and Castillo-Bienviedo. Keyes App. V 1055.

In addition, on two occasions, Reading police discovered Keyes wearing a bulletproof vest in houses where drug deals occurred. Officer Edwin Santiago testified that on February 18, 2003, he found Keyes sitting next to a firearm at 280 South 9th Street, where police discovered crack cocaine. Keyes App. I 101-07. Officer Jose Colon confirmed Officer Santiago's testimony, and reported that Keyes was wearing a bulletproof vest at the time of the search. Keyes App. I 130-31. Officer Edward Heim testified that on April 29, 2003, he and other officers served a search warrant at the first floor apartment of 37 South 9th Street. Inside the apartment the officers found Keyes, Goodrich, Wilfredo Ortiz, Lydia Carrera-Aponte, and a juvenile. Keyes App. II 385. The police recovered 73 packets of crack cocaine, three bulletproof vests, and $340 from the room. Once again, Keyes was wearing a bulletproof vest. Keyes App. II 390.

Keyes's and Peña's relationships with other sellers were corroborated by cell phone records. Tiffany Stambaugh, an intelligence analyst with the Reading Area Violent Crimes Task Force ("RAVCTF"), testified with regard to the telephone records of co-defendants Mustafa Sheriff, Calvin Goodrich, and Andrew Cruz. These records showed that Sheriff placed 856 calls to Keyes during the three-month period from February 1, 2003 to April 30, 2003. Keyes App. V 1170. During the same period, Sheriff made 556 calls to Cruz, 234 calls to Castillo-Bienvenido, 217 calls to Peña, 190 calls to Acevedo-Hernandez, and 165

calls to Goodrich. Keyes App. V 1170-71.

In spite of the argument that multiple conspiracies existed because "different people were caught at different places," Keyes was found at 280 South 9th Street, 37 South 9th Street, and 22 Orange Street during Reading police raids. In light of the testimony presented, we find that a trier of fact could have concluded that the 10th and Franklin Street gangs benefitted from exclusively selling drugs in the 10th Street area and were therefore committed to a single, common objective. A reasonable jury could infer that the constant communication, in just a three-month period, was representative of individuals with a common objective.

Further, a trier of fact could have concluded that Keyes and Peña and their co-defendants had an overlap in participation. Officer Gesh introduced a videotape of a surveillance he conducted on March 31, 2003 at 50th South 10th Street and identified Keyes, Goodrich, Castillo-Bienvenido, Sheriff, and Kenneth Williams standing together at that location. Keyes App. I 184. Kenneth Williams admitted he was arrested on April 16, 2003, in possession of 9.6 grams of crack cocaine and a .45 caliber handgun. He testified that drugs could be sold in the South 10th Street location only if they came from one of the defendants. Keyes App. II 331. He identified the sellers at this location as Peña, Goodrich, Castillo, Ortiz, and himself. Peña J.A. 259. Ortiz sold at that location for Peña. Peña J.A. 264. Williams sold for Sheriff and Cruz. Peña J.A. 261-63. He described how the sellers cooperated by taking turns making sales or pooling their drugs to fill larger orders. Peña J.A. 361. He also testified that he observed Keyes, Castillo-Bienvenido, Goodrich, and Peña working together packaging drugs at 37 South 9th Street. Keyes App. II 284-87, 320-21.

Jessica Almodovar, a juvenile, testified that Keyes, Goodrich, Sheriff, Peña, and

Castillo-Bienvenido sold drugs from 22 Orange Street and stated that Keyes, Sheriff, and Castillo-Bienvenido had given her drugs to sell. Keyes App. III 642-47. Jasmine Lawson admitted selling drugs in the area of 10th and Franklin Streets in the summer of 2002 and identified Keyes, Goodrich, Sheriff, Peña, Castillo-Bienvenido, and Acevedo-Hernandez as individuals involved in the drug trafficking in the area during the summer of 2002. Keyes App. IV 744, 754-61. Lawson also testified to seeing Castillo-Bienvenido and Sheriff "pistol-whip" another person who was attempting to sell drugs in the 10th Street area without permission. Keyes App. IV 761-64. Only sellers working for a member of the conspiracy were permitted to sell drugs at 10th and Franklin Streets. Keyes App. IV 767.

Lydia Carrera-Aponte testified that Goodrich, Sheriff, and Castillo-Bienvenido sold crack cocaine in front of her residence at 37 South 10th Street in June 2002. Keyes App. IV 829-32. In March 2003, she lived at 50 South 10th Street and again observed Goodrich, Sheriff, Peña, and Castillo-Bienvenido selling crack cocaine in her apartment building. Keyes App. IV 834-35. Later, while living at 37 South 9th Street, she observed Keyes, Goodrich, Sheriff, Ortiz, and Castillo-Bienvenido selling crack cocaine in that apartment building. Keyes App. IV 840-42. While "hanging out" at 22 Orange Street, Carrera-Aponte observed Keyes, Goodrich, Sheriff, and Castillo-Bienvenido selling crack cocaine. Keyes App. IV 847-49.

A trier of fact could have concluded that Keyes and Peña and the other defendants had an overlap in participation in the charged conspiracy. The evidence showed that the essential feature of this conspiracy was that its members cooperatively maintained control of the drug trafficking in the area of 10th and Franklin Streets, and dictated who was permitted to sell in that area. A reasonable jury could have found that Keyes and Peña participated in and

took advantage of this arrangement, and thus joined the conspiracy.

In so deciding, the jury in this case rejected the notion that squabbles among the organization's members, subdivided into separate territories, rendered them "competitors," taking them outside the conspiracy. This Court has stated that:

> If it is shown that an organized gang controls drug distribution in the defendant's neighborhood and that the gang has divided the neighborhood into zones in which only a single dealer may operate, then the fact that the defendant consistently sells his or her drugs only within certain geographical parameters would provide evidence that the defendant both knew of the existence of the conspiracy and was a participant in it.

United States v. Pressler, 256 F.3d 144, 151 (3d Cir. 2001). Viewing the evidence in the light most favorable to the government, as we must, we find a reasonable jury could have concluded beyond a reasonable doubt that the Appellants were supplied with drugs for distribution by Perez and Acevedo-Hernandez and knew of, and intended to benefit from, the mutual control of the area. Accordingly, the conspiracy convictions will be sustained.

**Reopening of Government's Case against Keyes**

Keyes argues that the district court improperly allowed the government to reopen its case. At the conclusion of the government's case-in-chief, defense counsel moved for judgment of acquittal as to Counts 2, 3, and 4 because the government failed to introduce evidence that the drugs seized on February 18, 2003 were crack. Keyes contends that introducing this evidence prejudiced him because without it the district court would have sustained his motion for judgment of acquittal as to Counts 2, 3, and 4. He further contends that he was prejudiced because the lab report entered into evidence after reopening was never previously shared with the defense counsel. In addition, Keyes argues that the government

11

did not provide the district court with an explanation for its failure to provide the required evidence.

The government contends that the district court did not abuse its discretion in allowing the prosecution to reopen its case. On the last day of the government's case-in-chief, the prosecution presented the testimony of several chemists employed by the Pennsylvania State Police Bureau of Forensic Services who had prepared lab reports on the drug evidence entered at trial. Chemist Erin Luck prepared two lab reports, but was mistakenly only asked about one report during the government's case-in-chief. The government contends that its explanation of 'inadvertent mistake' was sufficient. The government further contends that Keyes was not prejudiced because defense counsel had an opportunity to rebut this additional evidence.

The district court's decision on a motion to reopen is reviewed for abuse of discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971). When deciding whether to permit reopening, the court's focus is on whether the party opposing the reopening would be prejudiced if reopening is permitted. United States v. Kithcart, 218 F.2d 213, 220 (3d Cir. 2000). A critical factor in evaluating prejudice is the timing of the motion to reopen. United States v. Coward, 296 F.3d 176, 181 (3d Cir. 2002). In Coward, this Court reasoned that

> If [the motion to reopen] comes at a stage in the proceedings where the opposing party will have an opportunity to respond and attempt to rebut the evidence introduced after reopening, it is not nearly as likely to be prejudicial as when reopening is granted after all parties have rested, or even after the case has been submitted to the jury.

Id. at 181. In exercising its discretion, the court must also consider the character of the

12

testimony and the effect of the granting of the motion. Id. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. Id.

Further, "[t]he party moving to reopen should provide a reasonable explanation for failure to present the evidence [initially]." Kithcart, 218 F.2d 220; see also United States v. Blankenship, 775 F.2d 735, 740 (6th Cir. 1985) ("reopening is often permitted to supply some technical requirement such as the location of a crime – needed to establish venue – or to supply some detail overlooked by inadvertence"). In Kithcart, we reasoned that in order to properly exercise its discretion, the district court must evaluate the offered explanation and determine if it is both reasonable and adequate to explain why the government initially failed to introduce evidence that may have been essential to meeting its burden of proof. Id.

Here, the district court had the discretion to rule that the reopening would not prejudice Keyes because the motion to reopen was made in a timely fashion. The Government made its motion to reopen soon after resting its case-in-chief, the defense had not yet presented any evidence, and the case had not been submitted to the jury yet. Keyes App. V 1208. Therefore, the timing of the motion did not prejudice Keyes because there was an opportunity to respond and rebut the evidence during the defense case.

Despite Keyes's argument that permitting the Government to reopen its case was prejudicial because without the omitted testimony he would have been acquitted on three counts of the indictment, prejudice means more than the denial of an unearned windfall; it requires unfairness. The only claim of unfairness is based on the prosecution's failure to turn over a copy of the lab report on a timely basis, not that the timing of the production impaired

or prejudiced his defense. Keyes App. V 1207-08. Indeed, the defense did not ask questions regarding the conclusions reached by the chemists' testimony. Keyes App. IV 1226-27.

In addition, the prosecution provided a reasonable and adequate explanation when it admitted inadvertence:

> Yes, Your Honor, the Pennsylvania State Police routinely describe cocaine base or powder as just cocaine. Sometimes it is necessary in a federal case to go back and ask them to do a supplemental report that distinguishes between cocaine and cocaine base. That was done in this case. I did not receive a copy of that revised program until I had gone to Reading on Friday of last week. I have not provided a copy to counsel, and it was through inadvertence. The only difference, though, between this document and the one they had before is instead of calling it [cocaine, it is called cocaine base.]

Keyes App. V 1207-08. The district court accepted this as an adequate explanation of the prosecution's failure to introduce the evidence during its case-in-chief, stating, "All right. They can reopen. It's a minor matter, it won't take that long. Everybody makes mistakes. We had a mistake on the verdict sheet." Keyes App. V 1208.

The district court did not abuse its discretion when it determined that the prosecution could reopen its case because the defense was not prejudiced and the prosecution's explanation of its failure to introduce evidence was reasonable and adequate.

**Peña's Sentence**

Peña has objected to the sentence imposed, arguing that the sentencing court erred in considering factors not proven to a jury beyond a reasonable doubt – that he assumed a leadership role, his use of a weapon, and his prior criminal record.

Peña was convicted before but sentenced after the Supreme Court decided United States v. Booker, 543 U.S. 220, 244 (2005), holding that a defendant's Sixth Amendment

14

right to trial by jury is violated when his or her sentence is increased beyond the statutory maximum based on the sentencing judge's findings of fact beyond facts established by a plea of guilty, a jury verdict proved beyond a reasonable doubt, or those admitted by the defendant under a mandatory application of the United States Sentencing Guidelines. As we have explained, in light of that holding and the "remedial" opinion which rendered the Guidelines "effectively advisory," id. at 245, "district courts may fact-find to increase sentences beyond the Guidelines range provided they are within the statutory minimum and maximum dictated by the United States Code, take into account the relevant sentencing factors set out in 18 U.S.C. § 3553(a), and ultimately are 'reasonable.'" United States v. Gunter, 462 F.3d 237, 233-34 (3d Cir. 2006) (citing Booker, 543 U.S. at 244). Moreover, we have held that the *ex post facto* principles are not violated when the defendant has fair warning that the crime he committed is punishable up to the statutory maximum of the crime. United States v. Pennavaria, 445 F.3d 720, 723 (3d Cir. 2006). A defendant has fair warning that his sentence could be enhanced on judge-found facts as long as the sentence does not exceed the statutory maximum. Id. at 723-24. Thus, a defendant may be sentenced up to the statutory maximum of the crime committed without violating the defendant's due process rights. Id.

We have reviewed the record in this case to determine whether the district court erred in relying upon judge-found facts to enhance Peña's sentence beyond the statutory maximum for his crime. Peña was convicted of conspiracy to distribute cocaine base of 50 grams under 21 U.S.C. § 846. Peña J.A. 1397. The maximum penalty under the statute is life

15

imprisonment. 21 U.S.C. § 841(b)(1)(A). Peña was sentenced to 260 months in prison, below the statutory maximum. Peña J.A. 1461.

At the sentencing hearing held on March 14, 2005, over Peña's objection, the Government called Mustafa Sheriff and Manuel Perez to testify to the quantity of crack cocaine Peña distributed during the course of the conspiracy, his role in the conspiracy, and his possession of a gun. Peña J.A. 1426-52. Based on this testimony, the district court found, by a preponderance of the evidence, that he was responsible for the distribution of 1.5 kilograms of crack cocaine, was a leader/supervisor of the organization, and had possessed a firearm in connection with the offense. Peña J.A. 1454-57. Those findings, to which Peña has presented no factual rebuttal, made his offense level 42 and, with his criminal history of VI, his guideline sentencing range was determined to be 360 months to life. After considering the advisory Sentencing Guidelines and all relevant "3553(a) factors," including the seriousness of the offense and Peña's extensive criminal history, the court sentenced Peña to 260 months incarceration and five years supervised release. Peña J.A. 1457, 1459-61. This sentence was within the range allowed by statute, which imposed a mandatory minimum sentence of 10 years imprisonment and a maximum term of life imprisonment.[1]

We find the sentencing judge correctly applied the Guidelines in an advisory capacity in Peña's case, establishing that the applicable guideline range under the Sentencing

---

[1] The jury found that the conspiracy involved more than 50 grams of cocaine, and thus the statutory range was ten years to life. See 21 U.S.C. §§ 841(b)(1)(A), 846.

Guidelines would be 360 months to life.  In sentencing Peña to 260 months in prison, the judge explicitly acknowledged that the Sentencing Guidelines were advisory.  We find the sentence imposed to be reasonable, and we therefore affirm.

**Cell Phone Records**

Goodrich argues that the testimony of the Government's expert witness, an intelligence analyst, regarding cell phone calls among the alleged co-conspirators should have been excluded as hearsay.  Counsel objected to testimony that Goodrich possessed a particular cell phone number because, when he was arrested, he was not in possession of a cell phone.  Although the expert witness testified as to the names or initials or nicknames contained in the internal phone books of various cell phones seized, implicating Goodrich, the phones themselves were not brought into court, nor were the records from the cell phone companies brought in as business records.  Specifically, the expert witness testified that she reached the conclusion that a telephone number at issue belonged to Goodrich through "various proffer statements, and the number was listed under his known moniker, CJ, in various cell phones."  Goodrich Supp. App. 1126.  Goodrich argues that the witness should not have been allowed to rely solely upon information furnished to her by other investigators, who relied upon what was found in the cell phones seized from others.  His objection is that this testimony that a particular cell phone number belonged to him was hearsay and also deprived him of his right to confrontation.  Goodrich also argues that a chart listing calls allegedly made in furtherance of the conspiracy and a list of numbers from cell phones seized

17

by the FBI in this matter were not properly authenticated because the witness did not have personal knowledge that Goodrich possessed the phone number attributed to him.

The Government contends that its witness attributed a cell phone number to Goodrich based upon evidence previously admitted at the trial. For example, Kenneth Williams identified Goodrich as "CJ," referred to him by that nickname throughout his testimony, and identified the telephone number assigned to Goodrich. Goodrich Supp. App. 211-12, 219, 221, 235, 240, 245, 237-39. Five other cooperating witnesses also identified Goodrich as "CJ." Goodrich Supp. App. 211-12, 470, 603, 722, 793, 1018. Police Officer Edward Heim testified that he examined the cell phones seized during the investigation and he prepared a report listing the numbers programmed into the phones; the report was entered into evidence without objection. Goodrich Supp. App. 1089-90, 1154-55. Finally, FBI Special Agent Gregory Banis testified that he subpoenaed telephone records for three cell phones and provided the records to Government witness Tiffany Stambaugh of the National Guard Counter Drug Program. Goodrich Supp. App. 1103.

At trial, Stambaugh explained the analysis she performed on the phone records to identify the number of times each of the three phones called or had been called by phones allegedly belonging to other members of the conspiracy; she introduced charts she had prepared to illustrate her data. Goodrich App. 33-36; Goodrich Supp. App. 1122-24, 1127-39.

Castillo-Bienvenido has advanced the same argument, and has added that the records

received by Banis and analyzed by Stambaugh were in the form of a computer spreadsheet, rather than on paper. Accordingly, Stambaugh's analysis was based on a computer search through the records. Castillo-Bienvenido objected to the admission of testimony and exhibits regarding the phone records because no authenticating evidence was presented to establish how the wireless carrier compiled and maintained the phone records.

The standard of review for admissibility of evidence is abuse of discretion. United States v. Serafini, 233 F.3d 758, 768 (3d Cir. 2000). The district court did not abuse its discretion in allowing Stambaugh to describe a certain telephone number as belonging to Goodrich. She explained that the number was attributed to him due to proffer statements and the fact that it was listed under his known moniker, CJ, in various cell phones, including that of Kenneth Williams. Goodrich Supp. App. 1126-27. Such evidence was already in the record; Stambaugh's testimony can be viewed as summary testimony of evidence properly received.

Regarding the argument that no foundation was established to admit the phone company data as business records, Castillo-Bienvenido contends that Stambaugh's testimony failed to establish the authenticity and reliability of the data she received. The Government points out, however, that there was no objection to Stambaugh's testimony regarding her analysis of the phone records, which all parties accepted at trial. Because Castillo-Bienvenido's attorney never objected to the business records foundation of the phone records during Stambaugh's testimony, Appellant must establish plain error to prevail. See United

19

States v. Olano, 507 U.S. 725, 734-35 (1993). Although a proper foundation should have been laid for the phone records analyzed by Stambaugh, such an error did not affect the substantial rights of Castillo-Bienvenido. See Johnson v. United States, 520 U.S. 461, 467 (1997) (to establish plain error, an appellant must show that the error affected the outcome of the proceedings). The evidence provided regarding his phone records, that is, the frequency of calls between his number and three co-defendants, was of minimal significance in light of the other overwhelming evidence of Castillo-Bienvenido's guilt.

Therefore, we accept the Government's alternative argument that even if Stambaugh's testimony was improperly admitted, the error was harmless given the overwhelming evidence of Goodrich's and Castillo-Bienvenido's guilt. The record is replete with testimony implicating the Appellants in the conspiracy. Though corroborative of the witness testimony regarding the co-defendants' association with each other, the telephone records did not "make the case"; it was obviously the credibility of numerous cooperating witnesses offered at trial that convicted the Appellants.

**Testimony regarding Castillo-Bienvenido and a Firearm**

Finally, Castillo-Bienvenido has argues that he was unduly prejudiced by prior bad act testimony from a cooperating witness to the effect that he held a loaded gun to a man's back on a public street and wrestled with the man for control of the gun. Federal Rule of Evidence 404(b) prohibits the admission of other acts evidence for the purpose of showing that an individual has a propensity or disposition to act in a particular manner. Fed. R. Evid.

404(b).  The Court realizes that "the Government has broad latitude to use 'other acts' evidence to prove a conspiracy." United States v. Cross, 308 F.3d 308, 324 (3d Cir. 2002). To be admitted under Fed. R. Evid. 404(b), "(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its potential for unfair prejudicial effect under Rule 403; and (4) the Court must charge the jury to consider the evidence only for the limited purpose for which it is admitted." United States v. Vega, 285 F.3d 256, 261 (3d Cir. 2002) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

Castillo-Bienvenido was not charged with a firearms offense and the incident was not shown to be related to the charges against him.  Therefore, although represented to be probative of the allegations in the conspiracy indictment, the testimony should have been excluded, as it only served to show a tendency to do bad acts. See United States v. Davis, 183 F.3d 231 (3d Cir. 1999).  Moreover, once the testimony was admitted, the district court should have charged the jury to consider the evidence only for the limited purposes for which it was offered.  It did not, although during discussion of this issue at trial, the court indicated that it would give a cautionary instruction.

Some errors are so unimportant and insignificant in the setting of a particular case "that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." United States v. Hasting, 461 U.S. 499, 508 (1983).  The Supreme Court has made it clear that a reviewing court must consider the trial

record as a whole, ignoring errors that are harmless. Id. at 509. The Court reasoned that "given the myriad of safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, prefect trial, and that the Constitution does not guarantee such a trial." Id. at 508-09 (citing Brown v. United States, 391 U.S. 123, 135 (1968)).

Considering the trial record as a whole, the district court's failure to give a limiting instruction concerning the testimony of Castillo-Bienvenido's use of and struggle with a gun was harmless error. As the Government noted, testimony was properly admitted that Castillo-Bienvenido and a co-defendant pistol-whipped an individual for selling drugs without permission in the vicinity of the conspiracy's drug locations. Castillo App. III, 859-60. We cannot say, therefore, that the disputed testimony combined with the court's failure to give a limiting instruction warrants reversal.

## CONCLUSION

For the forgoing reasons, the judgments entered by the district court is affirmed.