UNITED STATES of America, Appellee,

v.

**Joseph KELLY, Appellant.**

No. 88–1638.

United States Court of Appeals, Third Circuit.

Argued Sept. 5, 1989.

Decided Dec. 19, 1989.

Rehearing and Rehearing In Banc Denied Jan. 17, 1990.

---

13. *See* note 1 *supra*.

Albert John Snite, Jr. (argued), Philadelphia, Pa., for appellant.

Michael M. Baylson, U.S. Atty., E.D. Pennsylvania, Joel M. Friedman, Atty. in Charge, Philadelphia Strike Force, Michael L. Levy (argued), Barry Gross, Sp. Attys., Philadelphia, Pa., for appellee.

Before MANSMANN, NYGAARD and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Joseph Kelly appeals from a judgment of sentence following his conviction on charges stemming from a scheme to import phenyl–2–propanone (P2P), a chemical used to manufacture methamphetamine, into the United States. He was convicted of one count of conspiracy to possess and manufacture methamphetamine, four counts of importation of P2P, and one count of attempted importation of P2P. Kelly claims that he was unfairly prejudiced by a variance between the singular conspiracy charged in the indictment and evidence at trial which demonstrated multiple conspiracies. He also claims his Sixth Amendment right of confrontation was violated when the district court admitted videotaped depositions into evidence which were taken without his presence in Belgium. For the reasons that follow, we reject these arguments and will affirm the judgment of the district court.

### I.

Kelly and twenty-seven other individuals were charged with a wide-ranging conspiracy to import and distribute P2P and to

manufacture and distribute methamphetamine during the period from July, 1983 to June, 1987. Broken down to its bare essentials, the conspiracy count alleged that Kelly was part of a group led by Steven Vento, Sr., and Angelo DiTullio which imported P2P into the United States from Europe. The DiTullio/Vento organization then sold the P2P to a group led by John A. Renzulli which was responsible for the manufacture and distribution of methamphetamine. In June, 1985, the entire operation was brought under the control of the Philadelphia-based organized crime syndicate known as La Cosa Nostra (LCN). The district court severed the case into three trials whereby the respective members of the DiTullio/Vento organization, the Renzulli organization, and the LCN were tried separately.

The import operation began in 1984, when Vento purchased P2P in Germany. Vento imported one shipment to the United States before he was convicted on drug charges. In early 1985, Vento met with DiTullio at the Philadelphia Detention Center. Vento informed DiTullio that he had ordered several barrels of P2P in Europe and that he, being incarcerated, needed DiTullio's help to bring the P2P into the United States. Vento made DiTullio his partner in the import business, and suggested that the P2P could be shipped in air compressors from overseas. DiTullio was to send people overseas to ship the P2P to the United States.

Kelly worked under the direction of DiTullio shipping the P2P from Europe to the United States from June, 1985 until they had a falling out sometime in 1986. Kelly transported one shipment of P2P in June, 1985, by storing the chemical in an air compressor and having it shipped from Hamburg, West Germany, to Philadelphia. In August, 1985, Vento and DiTullio made arrangements to import another thirty gallons of P2P from Europe. DiTullio told Vento that the P2P would be concealed in barbecue grills. Vento placed the order and in September, 1985 shipped thirty gallons in the gas containers of the barbecue grills. That same month, Vento ordered another one hundred and fifty gallons of P2P from a pharmaceutical company in Belgium. Kelly picked up the P2P in November, 1985 and delivered it to a rented warehouse in Brussels. In February, 1986, Edmund Gifford joined the P2P smuggling ring. In March, 1986, Kelly and Gifford shipped fifty gallons of P2P in barbecue grills from Brussels to Philadelphia.

While Kelly was operating in Europe in 1985 and 1986 the Philadelphia LCN gained control over DiTullio's smuggling ring. Two LCN operatives, Nicholas Caramandi and Thomas DelGiorno, testified that in 1984 and 1985 the LCN became aware of DiTullio's criminal enterprise. The LCN approached DiTullio and told him that he had to pay a "street tax" of $2,000 to the LCN for every gallon of P2P brought into the United States. DiTullio was told that if he continued to import P2P without paying the LCN, he would be killed. Not surprisingly, DiTullio began to pay.

The only challenge to the LCN's control of the operation occurred in 1986, when Vento, now incarcerated at Lewisburg Federal Penitentiary, discovered that DiTullio was paying a street tax to the LCN. Vento's son, Steven Vento, Jr., declared that he was not going to pay. In May, 1986, DelGiorno received approval from LCN "boss" Nicodemo Scarfo to kill Vento, Jr. On May 27, 1986, Vento, Jr. was shot by members of the LCN. They failed to kill Vento, Jr., but following the attempt, Vento, Sr. was obviously out of the operation.

Sometime in 1986, Kelly double crossed DiTullio, and thereafter dealt directly with the LCN. Caramandi testified that DiTullio told him Kelly and an LCN member named Ralph Staino had stolen several gallons of P2P from DiTullio in Europe. This theft followed an argument between Kelly and DiTullio in which Kelly said he was quitting. When confronted by Caramandi, Staino admitted the theft. When the news of the missing P2P was reported to DelGiorno in June, 1986, DelGiorno made arrangements to have Kelly and Staino ship the stolen P2P to the United States without DiTullio. Now, both Vento and DiTullio had been cut out of this smuggling racket.

After they imported and transferred the stolen P2P, DelGiorno, Caramandi and Staino decided to work with Kelly to bring more P2P into the United States. Kelly and Edmund Gifford went back to Europe in the fall of 1986 to purchase more P2P. The evidence obtained from European witnesses by virtue of videotaped depositions established that Kelly and Gifford purchased additional quantities of P2P in Belgium. DelGiorno and Caramandi did not know if the new shipment ever arrived in the United States since they began cooperating with the government in November, 1986.

Kelly, together with DiTullio, Gifford and Romolini, was tried before a jury in April, 1988.[1] The jury returned guilty verdicts against Kelly on the conspiracy count and on four importation counts and one count of attempted importation. On August 9, 1988, Kelly was sentenced to five years imprisonment on the conspiracy count and received concurrent sentences on the importation counts. This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The government's theory at trial was that a classic chain conspiracy was created, where a product is first transported, then refined, and then distributed to the ultimate user. Kelly argues that he was unfairly prejudiced by a variance between the single conspiracy charged in the indictment and evidence at trial, which he claims proved several conspiracies.

Kelly claims that the LCN was not a partner in a conspiracy, but rather is an omnipresence of the criminal culture, which muscled its way into this drug business through threats and extortion. Conversely, he contends that whatever chain existed vanished in 1986 when he broke with DiTullio and worked directly with the LCN importing P2P. He further argues that he was unfairly prejudiced since the government used evidence of crimes committed by others in order to prove a single conspiracy.

## A.

A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant. *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir.1985). This rule is designed to protect the right of the defendant "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States*, 328 U.S. 750, 775, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies. *United States v. Smith*, 789 F.2d 196, 200 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Here, the district court properly instructed the jury that it could convict only if the government proved the single conspiracy charged in the indictment and not some other separate conspiracy. Nonetheless, even "a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." *Smith*, 789 F.2d at 200.

The question is whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment. *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir.1989). We review to determine whether the record, when viewed in the light most favorable to the government, contains substantial evidence to support the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Furst*, 886 F.2d 558, 565–66 (3d Cir.1989).

## B.

The essence of a conspiracy is an agreement. *United States v. Nolan*, 718

---

1. Two other co-defendants, Michael Forte, who was involved in the conspiracy for a brief time in 1985, and Dominic Picuri, pled guilty on the second day of trial.

F.2d 589, 595 (3d Cir.1983). The government need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act. Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the government's case. *Id.* Here, the government proved, and Kelly does not seriously dispute, that he was part of a conspiracy to import P2P to the United States as part of the DiTullio/Vento organization. The question is whether the single conspiracy alleged in the indictment broke up into separate conspiracies beginning in 1985 with the entry of the LCN.[2]

■ We will employ a three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies. *United States v. DeVarona,* 872 F.2d 114 (5th Cir.1989). First, we examine whether there was a common goal among the conspirators. *DeVarona,* 872 F.2d at 118. Second, we look at the nature of the scheme to determine whether "the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. *DeVarona,* 872, F.2d at 119 (*quoting United States v. Perez,* 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067 & 3068, 41 L.Ed.2d 664 (1974)). Third, we examine the extent to which the participants overlap in the various dealings. *DeVarona,* 872 F.2d at 118.

As for the first factor, the common goal of all the participants was simply to make money selling "speed." Although the various personnel changed during the period from 1983 to 1987, the central purpose was constant and pervasive. The entry of the LCN into the import operation in 1985,

although both uninvited and unwanted, destroyed nothing of the conspiracy. It simply added another player to the original scheme. While the conspirators were forced to accept the role of the LCN, whose alternative was undoubtedly quite inappropriate for legitimate business, no one was forced into nor compelled to remain in the P2P business. In fact, the evidence established that the LCN was quite happy to let DiTullio operate as before so long as it received its street tax of $2000 for every gallon sold.[3] Thus, the operation did not, as appellant argues, exist solely to maximize the profit of the LCN. The evidence overwhelmingly establishes that this was an enterprise in which everyone made a gluttonous profit.

■ Turning to the second factor cited in *DeVarona,* the nature of the scheme, the success or failure of the methamphetamine operation depended on a steady supply of P2P from Europe. Thus, the activities of one group, the DiTullio/Vento organization, were " 'necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture.' " *DeVarona,* 872 F.2d at 118 (*quoting United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982)). The change in the cast of characters in 1985 and 1986 did not mitigate the need for a continuous supply of P2P. A single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership. *See United States v. Vila,* 599 F.2d 21, 24 (2d Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). While Forte was cut out; DiTullio was double-crossed; and Vento, Jr. was shot, the conspiracy survived, Darwinian fashion, and continued to operate. The only change was that now Kelly operated directly with the LCN. In fact, Kelly was

---

**2.** Kelly also argues that the testimony of Caramandi, DelGiorno and Vento, Sr. of statements made to them by DiTullio and Staino about Kelly's role in the conspiracy, is inadmissible hearsay. The argument has no merit. Fed.R. Evid.P. 801(d)(2)(E) provides that such testimony is not hearsay because it is offered against a party by a co-conspirator. There was sufficient corroborating testimony from the European witnesses concerning Kelly's activities to allow for a preliminary finding that a conspiracy existed

between DiTullio and Kelly, and later on, between Kelly and Staino.

**3.** Caramandi testified that when he initially shook down DiTullio, the P2P was selling for $20,000 a gallon. Caramandi allowed DiTullio to raise the price to $22,000 per gallon to cover his loss of profit from having to pay the street tax.

the one constant member during the course of the conspiracy.

As for the third *DeVarona* factor, the degree to which the participants overlap, "the government need not prove that each defendant knew all the details, goals, or other participants" in order to find a single conspiracy. *Theodoropoulos*, 866 F.2d at 587. Kelly cites the infighting among the conspirators after entry of the LCN as evidence that the participants were only looking out for themselves and not working in concert. Disputes between participants do not necessarily fracture a single conspiracy. *DeVarona*, 872 F.2d at 120; *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). The common catalyst of these disputes was greed. No player wanted to be left out of the operation. There were no separate conspiracies acting at cross-purposes with each other. *Cf. United States v. Camiel*, 689 F.2d 31 (3d Cir.1982) (variance found where evidence established existence of separate conspiracies which consisted of two antagonistic factions which would not work together). All evidence points to a single conspiracy in which Kelly was a willing member for its duration.

There simply was no variance between the conspiracy alleged in the indictment and the evidence presented at trial. The jury's finding of a single conspiracy is supported by sufficient evidence.

### III.

■ Kelly next argues that the district court erred by admitting into evidence deposition testimony taken in Belgium. He claims that since the depositions were taken without him, the procedure violated the Sixth Amendment's Confrontation Clause.

### A.

On September 11, 1987, the government filed a motion to take pretrial depositions in Belgium, pursuant to Fed.R.Crim.P. 15. In its motion the government stated that witnesses it intended to call, while agreeing to testify, were foreign nationals and unwilling to travel to the United States for trial. It further averred that the United States had no power to enforce a subpoena requiring a foreign national residing outside the United States to appear at trial. These witnesses were to provide essential testimony concerning the activities of the defendants in procuring the P2P and shipping it to the United States. The government stated that it would allow any defendant who was free on bail to attend the depositions in Belgium at government expense. As for defendants who were subject to pre-trial detention, the government requested that the Belgian authorities allow the United States to transport the defendants to Belgium. In the event that the Belgian authorities would not allow the incarcerated defendants to attend, the government proposed a telephone hookup from Belgium to Philadelphia so the incarcerated defendants could hear the deposition live, consult with their attorneys, and take part in cross examination. The district court granted the motion and appointed the Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, to serve as Special Master for the proceedings.

Kelly and co-defendant Gifford, both pre-trial detainees, requested permission to attend the depositions. The Belgian authorities refused the requests of the United States government, and forbade the incarcerated defendants to attend. The depositions were taken in November, 1987, at the United States Embassy in Brussels, with Kelly's attorney present. An open telephone line was provided so that Kelly and Gifford could hear the testimony. In addition, private telephones were available for the defendants to confer privately with their attorneys. *Id.* The entire proceeding was videotaped. The videotapes were played at trial over Kelly's objections. *See United States v. Gifford*, 684 F.Supp. 125 (E.D.Pa.1988).

Since Kelly challenges the district court's application of legal precepts, our review is plenary. *United States v. Adams*, 759 F.2d 1099, 1106 (3d Cir.), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

### B.

Kelly's Confrontation Clause argument is based entirely on the Supreme Court's decision in *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 1988), which was announced two months after his trial. In *Coy*, the defendant was convicted of sexually assaulting two 13–year old girls. At the commencement of trial, the State, pursuant to statute, requested that the complaining witnesses testify via closed-circuit television or that a screen be placed between the witnesses and the defendant. The trial court permitted a large screen to be placed between the defendant and the witness stand during the girls' testimony. With lighting changes in the courtroom, the effect was akin to that of a one-way mirror; the defendant was able to "dimly perceive the witnesses, but the witnesses to see him not at all." 108 S.Ct. at 2799. The defendant claimed the procedure employed at trial violated his right of confrontation.

The Supreme Court agreed and reversed the conviction, holding that the use of the screen violated the core concept of confrontation; the right of a criminal defendant to confront his accuser "face-to-face". The Court reasoned that the right to confrontation is not overridden by the State's interest in shielding the victims of sexual abuse from the trauma of testifying in open court. While the Court did not rule out the possibility of exceptions to the face-to-face requirement, such exceptions may be allowed only when (1) it is necessary to further an important public policy objective, and (2) the important public policy objective is " 'firmly rooted in our jurisprudence.' " 108 S.Ct. at 2803 (*quoting Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987)). The Court rejected the notion that the Iowa statute, enacted in 1985, was so firmly rooted as to provide an exception to the face-to-face mandate of the confrontation clause. *Id.*

Kelly does not assert that *Coy* created an absolute right to a face-to-face confrontation. He concedes that a long line of case law has established exceptions. *See e.g. Coy*, 108 S.Ct. at 2804 (O'Connor, J., concurring) ("[T]he Court has time and

again stated that the Clause 'reflects a *preference* for face-to-face confrontation at trial', and expressly recognized that this preference may be overcome in a particular case if close examination of 'competing interests' so warrants.") (*quoting Ohio v. Roberts*, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (1980) (emphasis in original)). Instead, Kelly argues that "the present testimony of living, non-conspiratorial fact witnesses, not incriminating themselves and not in fear of death; and, in fact, offering evidence that form links in the chain of guilt, is not a class of witness or testimony that the Constitution permits to be introduced without the presence of a witness." Reply brief at 2.

Read in context, *Coy* does not overrule Supreme Court precedent which applies to situations, as here, where the declarant is *unavailable* to testify at trial. *See Bourjaily*, 107 S.Ct. at 2782 ("While a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, this Court has rejected that view as 'unintended and too extreme.' ") (*quoting Roberts*, 448 U.S. at 63, 100 S.Ct. at 2537). In such cases, a court must determine if the statement contains sufficient "indicia of reliability." *Bourjaily*, 107 S.Ct. at 2782–83; *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Since the Confrontation Clause and the rule against hearsay are designed to protect similar values, the out-of-court statement is presumed to have sufficient indicia of reliability if it falls within an established exception to the hearsay rule which is "firmly rooted in our jurisprudence." *Id.*

### C.

With these principles in mind, we must next determine whether the deposition testimony falls within an established exception to the hearsay rule. The government argues that these out-of-court statements fall under the exception for prior testimony, as set forth in Fed.R.Evid. 804(b)(1). Under Rule 804(b)(1), an unavailable declarant's former testimony is admissible so long as the former testimony was given "in a depo-

sition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The former testimony exception is firmly rooted in our jurisprudence. The prior testimony exception was first recognized in *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Since *Mattox*, the Supreme Court has repeatedly stated that the admission of prior testimony does not violate the Confrontation Clause. *See e.g. Ohio v. Roberts*, 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8; *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972).[4] *See also United States v. Salim*, 855 F.2d 944, 954–55 (2d Cir.1988) (holding that former testimony exception of Rule 804(b)(1) was "firmly rooted in our jurisprudence").

Our next inquiry is whether the deposition testimony satisfied the requirements of Fed.R.Evid.P. 804(b)(1). First, the foreign witnesses were unavailable for trial. A witness is unavailable for trial when " 'the proponent of [the witness' prior] statement has been unable to procure his attendance by process or other reasonable means.' " *United States v. Steele*, 685 F.2d 793, 808 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) (*quoting* Fed.R.Evid. 804(a)(5)). " 'The lengths to which the prosecution must go to produce a witness ... is a matter of reasonableness.' " *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543 (*quoting California v. Green*, 399 U.S. 149, 189, 90 S.Ct. 1930, 1951, 26 L.Ed.2d 489 (1970)). We conclude that since the government had no power to compel the witnesses to attend, it adopted a reasonable solution when it deposed them in Europe.

The next step is to determine whether the deposition was taken "in compliance with law." The deposition was conducted in accordance with Fed.R.Crim.P. 15.[5] Judge Palmieri, in his report to the district court, noted his belief that the proceedings "comported with the dictates of due process and with the Federal Rules of Criminal and Civil Procedure." The deposition was conducted in compliance with the law. The witnesses were under oath. The attorneys for the defendants were present. It was supervised by an American judge applying American evidentiary rules.[6]

Finally, we must decide whether Kelly had an opportunity to cross-examine the deposed witnesses. Appellant argues that he could not take a meaningful role in the cross-examination because he was not physically present to consult with his attorney. We reject this argument. The defendants were able to listen to the depositions live and consult with their attorneys by a private telephone line. This afforded them a reasonable opportunity to take part in

---

4. In *Roberts*, the Court noted other exceptions which were firmly rooted in our jurisprudence, including the dying declaration exception and the business and public records exception. 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8 (citations omitted).

5. Kelly does not claim that the procedure employed violated Rule 15. His co-defendant, Gifford, does. Gifford argued that taking the deposition violated Rule 15(b), which provides that the defendant shall be "in the presence of the witness" during the deposition. We rejected that argument because a strict reading of subsection (b) would defeat the purpose of the rule, which is to preserve essential testimony when it is in the interest of justice to do so. *United States v. Gifford*, 892 F.2d 263, 265 (3d Cir. 1989).

6. The procedures employed here are in stark contrast to those approved in *United States v.*

*Salim*, 855 F.2d 944, 947 (2d Cir.1988). In *Salim*, the government sought to depose a witness who was in French custody. The defendant was unable to attend the deposition in France, which was held pursuant to French rules of court which only permits questions by attorneys to be submitted in writing to the presiding magistrate. French law also prohibited the defendant's attorney being present in the room while the witness testified. In spite of these difficulties, the Second Circuit upheld the use of the deposition testimony, holding that "unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable ..., a deposition taken pursuant to letter rogatory in accordance with the law of the host nation is taken in 'compliance with law' for purposes of Rule 804(b)(1)." 855 F.2d at 953 (citations omitted).

this cross-examination. *See e.g. Salim*, 855 F.2d at 949 (deposition procedure adequate even though defendant was not permitted to view or listen to the testimony via simultaneous video or audio broadcast). That appellant was not physically present, not face-to-face with the witnesses, did not deprive him the opportunity to cross-examine the deposition witnesses. We conclude that admitting this videotape deposition into evidence under these circumstances did not violate Kelly's right of confrontation.

Accordingly, we will affirm the judgment of the district court.