**UNITED STATES of America,**

v.

**Stephen FAUSNAUGHT.**

**No. 09–1126.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) on March 23, 2010.

Opinion Filed: May 20, 2010.

Francis P. Sempa, Esq., Office of United States Attorney, Scranton, PA, for Plaintiff–Appellee.

Jules Epstein, Esq., Kairys, Rudovsky, Messing & Feinberg, Louis T. Savino, Jr., Esq., Louis T. Savino & Associates, Philadelphia, PA, for Defendant–Appellant.

Before: RENDELL, FUENTES, and JORDAN, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge:

Steven Fausnaught was convicted by a jury on all twelve counts in a third superseding indictment. The charges against him included conspiracy to distribute and possess with intent to manufacture and distribute methamphetamine and marijuana, in violation of 21 U.S.C. § 846. Fausnaught raises two issues on appeal. First, he argues that his conspiracy conviction should be vacated because there was a variance between the indictment and the proof presented at trial as to the existence of a single conspiracy and this variance prejudiced a substantial right. Second, he contends that the District Court erred at sentencing both by attributing to him a quantity of methamphetamine distributed by a co-defendant and by enhancing his sentence for possession of a firearm in connection with the offense. We find that no variance existed and that the District Court did not err at sentencing. Accordingly, we uphold Fausnaught's conviction and affirm his sentence.

### I.

Because we write primarily for the parties, we only discuss the facts and proceedings to the extent necessary for resolution of this case. Testimony presented to the jury at trial revealed that sometime in the early 1990s, Fausnaught began supplying marijuana on a consignment basis to Charles Sechler, Shane Mowrer, Timothy Moore, Robert Levan, and others. Fausnaught took over the role of his brother Michael, who had supplied marijuana up until his death from a drug overdose. Fausnaught "fronted" the product to these individuals: he would give drugs to them and they would in turn sell the drugs and

repay him from the proceeds. In December 1995, Fausnaught's residence was raided by police. During the raid, the police found marijuana, firearms, scales, packing material and money. They arrested Fausnaught. While in police custody, Fausnaught telephoned Moore and instructed him to contact the people that were fronted marijuana and owed him money in order to collect payment. Moore contacted Sechler, Levan and others and collected approximately $12,000, which was used as bail money for Fausnaught. The drug evidence obtained in the raid was ultimately suppressed and Fausnaught was not convicted of any related charges.

For a period following the raid, Fausnaught ceased supplying marijuana. In Fausnaught's absence, Sechler began supplying Moore and others with marijuana that Levan transported from California. Fausnaught eventually resumed selling marijuana to Moore and John Rundle. Fausnaught, Sechler, and others also traveled together to Amsterdam to attend the Cannabis Cup, an international marijuana growing competition, to procure high-quality marijuana seeds for a grow operation in Sechler's farmhouse.

In approximately 2000, both Fausnaught and Sechler began selling methamphetamine. Fausnaught sold methamphetamine to Rundle and Sechler sold methamphetamine to Moore. Moore testified that he would pick up methamphetamine from Sechler at the same time that Moore was picking up marijuana. This methamphetamine was stored in Sechler's farmhouse, where marijuana was stored and grown. It also came from the same source, in California, from which Sechler obtained marijuana. Rundle testified that he obtained methamphetamine from Fausnaught starting sometime in 2000 and ending in October 2002, when Rundle's residence was searched by police. Rundle had been buying marijuana from Fausnaught since approximately 1997 and continued to do so while purchasing methamphetamine.

During the months leading up to a January 2003 raid on their respective residences, Fausnaught and Sechler maintained regular contact. Indeed, pen register records show that between February and July 2002, the pair were in telephone contact with one another eighty-seven times. Additionally, between October 2002 and the date of the raid, Fausnaught and Sechler made telephone contact eighty-nine times. Furthermore, on October 7, 2002, police officers conducting surveillance saw Fausnaught at Sechler's farmhouse, where a witness had testified marijuana and methamphetamine were stored. The two were seen loading something into Fausnaught's vehicle.

On January 11, 2003, the police executed warrants on Fausnaught's residence and Sechler's residence and farmhouse. At Fausnaught's residence, the police found guns, money, marijuana, a scale and packing material. The police raid on Sechler's farmhouse yielded money, drug paraphernalia, and a number of objects—literature about cultivating marijuana, a shopping list, and empty seed bags from Amsterdam—suggesting a grow operation.

An initial indictment against Fausnaught, Rundle, David Benjamin and Moore was returned on February 11, 2003. It charged conspiracy to distribute methamphetamine and marijuana, as well as related crimes. Subsequent superseding indictments added other Defendants and removed Rundle and Moore. The third superseding indictment, which the grand jury returned on August 12, 2003, contained twelve counts against Fausnaught and Sechler. Fausnaught was charged with conspiracy to distribute and possess with intent to distribute in excess of 500

grams of methamphetamine and in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. § 846, as well as related offenses.

On July 30, 2007, following a six-day trial, Fausnaught and Sechler were convicted on all charges levied against them in the third superseding indictment. Fausnaught was found to have an offense level of 40 under the sentencing guidelines because his offense involved at least 15 kilograms of methamphetamine and 100 kilograms of marijuana and dangerous weapons were possessed in connection with the offense. As a result, Fausnaught's advisory sentencing guidelines range was 292 months to 365 months in prison. Fausnaught was subsequently sentenced on December 29, 2008 to 292 months in prison, followed by five years of supervised release, and was ordered to pay a special assessment of $900.

Thereafter, Fausnaught filed this appeal.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

### A. Variance between the indictment and the evidence at trial

We must vacate a conviction "when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir.1989); *see also United States v. Kemp*, 500 F.3d 257, 287 (3d Cir.2007). Fausnaught argues that a variance exists in his case, because, while the indictment charged a single conspiracy, at trial the Government proved multiple conspiracies. Fausnaught contends that, as a result of this alleged variance, the jury heard extensive evidence about drug sales and weapons possession

that would have been otherwise inadmissible, and that this consequently prejudiced him.

To distinguish between single and multiple conspiracies, we generally consider three factors: (1) whether the conspirators shared a common goal; (2) whether the agreement "contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators;" and (3) "the extent to which the participants overlap in the various dealings." *Kelly*, 892 F.2d at 259 (internal citations and quotations omitted). The absence of one of these factors, however, "does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir.1992). Whether a single conspiracy or multiple conspiracies exist is a fact question that is entrusted to the jury and which we will sustain if there is substantial evidence to support the jury's determination. *United States v. Perez*, 280 F.3d 318, 345 (3d Cir.2002). We review the record in the light most favorable to the government. *Kemp*, 500 F.3d at 287.

The first factor we consider is whether there was a common goal among the conspirators. In assessing whether the defendants shared a common goal, we look to the underlying purpose of the alleged criminal activity. *See, Kelly*, 892 F.2d at 259. In *Kelly*, the "common goal of all the participants was simply to make money selling 'speed.'" *Id.* Similarly, the common goal among Fausnaught, Sechler, and their coconspirators was to make money from selling drugs. This was a goal that Fausnaught, Sechler, and others pursued through coordinated efforts from prior to 1995 through 2003.

Next, we consider whether the conspirators' agreement sought to accomplish a continuous result that would not persist without the continuous cooperation of the

conspirators. We have considered this element satisfied where the "evidence supports a finding that the activities of others were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *United States v. Salmon,* 944 F.2d 1106, 1117 (3d Cir.1991) (citation and internal quotations omitted). Fausnaught argues that there were no continuous results intended, nor was there continuous cooperation, as he dropped out of the picture for a brief period of time following the 1995 raid on his home. Testimony revealed, however, that the conspiracy persisted and that Fausnaught shortly returned to it. Moreover, there is no indication that he attempted to withdraw from the conspiracy. *See United States v. Kushner,* 305 F.3d 194, 198 (3d Cir.2002) (noting that withdrawal from a conspiracy requires more than the cessation of criminal activity and typically demands either confession to the proper authorities or communication to one's co-conspirators that an individual has abandoned the enterprise and its objectives). The record at trial included substantial evidence of activities by members of the conspiracy that were necessary to further its overall purpose of making money through the sale of drugs. This included, *inter alia,* the transportation of drugs; the supply, distribution and sale of the drugs; storage of the drugs at the residences of members of the conspiracy; and travel to Amsterdam to obtain materials for the growing of marijuana.

Finally, we consider the extent to which participants overlap in the various dealings. " '[T]he government need not prove that each defendant knew all the details, goals, or other participants' in order to find a single conspiracy." *Kelly,* 892 F.2d at 260 (citation and internal quotations omitted). Here, there is significant overlap between the participants, as Fausnaught concedes in his brief. We note just a few points of overlap. Moore purchased marijuana from both Sechler and Fausnaught at different points in time. He continued to purchase marijuana from Fausnaught at the same time that he was purchasing methamphetamine from Sechler. Levan both purchased marijuana distributed by Fausnaught and transported marijuana for Sechler. Fausnaught and Sechler traveled to Amsterdam together to obtain marijuana seeds. At Fausnaught's request, Moore contacted other members of the conspiracy to obtain money they owed to Fausnaught in order to help him in making bail. This and other evidence presented at trial reveal sufficient overlap to prove a single conspiracy.

Our analysis is not affected by the fact that the evidence only established that Sechler supplied methamphetamine to Moore and Fausnaught supplied it to Rundle. "[A] finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." *United States v. Smith,* 789 F.2d 196, 200 (3d Cir.1986). Given the network of overlapping interactions among the Defendants, with the shared goal of making money from the sale of drugs, the jury did not err in finding a single conspiracy involving both marijuana and methamphetamine. Having found that no variance existed, we need not address Fausnaught's arguments regarding prejudice.

## B. Sentencing issues

 Fausnaught argues that the District Court erred at sentencing when it attributed to him a quantity of methamphetamine distributed by Sechler. We review for clear error the District Court's findings of fact regarding the relevant quantity of drugs attributable at sentencing. *United States v. Gibbs,* 190 F.3d 188, 197 (3d Cir.1999); *see also United States*

v. *Grier*, 475 F.3d 556, 570 (3d Cir.2007) ("[T]his Court will continue to review factual findings relevant to the Guidelines for clear error and to exercise plenary review over a district court's interpretation of the Guidelines.") Under Section 1B1.3(a)(1)(B) of the Sentencing Guidelines, a defendant's base offense level is determined by considering, among other factors,

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

We have held that "whether an individual defendant may be held accountable for amounts of drugs involved in reasonably foreseeable transactions conducted by co-conspirators depends upon the degree of the defendant's involvement in the conspiracy." *United States v. Collado*, 975 F.2d 985, 995 (3d Cir.1992). We assess involvement by considering whether the co-conspirator's drug transactions were: (1) "in furtherance of the ... jointly-undertaken activity;" (2) "within the scope of the defendant's agreement;" and (3) "reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." *See id.* (quoting U.S.S.G. § 1B1.3).

Fausnaught argues that Sechler's methamphetamine transactions should not be attributed to him because, while the two had prior dealings involving marijuana, there was "no proof that the two shared suppliers or customers" for methamphetamine. (Appellant's Br. at 22.) The jury convicted Fausnaught and Sechler of participating in a conspiracy to distribute both marijuana and methamphetamine. Fausnaught and Sechler played central roles within this conspiracy. The evidence showed that Fausnaught and Sechler frequently spoke to each other by telephone and met in person during the period in which they were distributing methamphetamine. Police officers observed Fausnaught with Sechler moving a package from Sechler's farmhouse, in which a witness testified that methamphetamine was stored, into Fausnaught's car. Given this and other evidence in the record, we find no basis to conclude that the District Court erred when it determined that the methamphetamine distributed by Sechler was within the scope of and in furtherance of the conspiracy proven at trial and that this transaction was reasonably foreseeable to Fausnaught.

■ Fausnaught also argues that the District Court erred by enhancing his offense level by two levels for possession of a dangerous weapon in connection with the offense. Fausnaught did not raise this objection at sentencing. The commentary to U.S.S.G. § 2D1.1(b)(1) states that this enhancement should be applied when a weapon is present unless it is "clearly improbable that the weapon was connected with the offense." *United States v. Drozdowski*, 313 F.3d 819, 820 (3d Cir.2002). A rifle and shotgun were found in Fausnaught's residence during the search on January 11, 2003, a search that also yielded marijuana, methamphetamine, a scale, cash, an owe sheet, and drug paraphernalia. Guns had also been found, with drugs and related materials, during the December 1995 search of Fausnaught's residence. The inventory receipt from that search was admitted into evidence at the trial, as well as two of the guns seized. Additional firearms, and drugs, were found in the search of the residence of John Rundle, one of Fausnaught's coconspirators. Given these facts, we find that it was not clearly improbable that the guns found in Fausnaught's residence were connected to the drug conspiracy.

204

For the foregoing reasons, we affirm Fausnaught's conviction for conspiracy as well as his sentence.