NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4188
_____

UNITED STATES OF AMERICA

v.

DORIAN SWAN,
Appellant
_____

APPEAL FROM THE DISTRICT COURT
OF THE VIRGIN ISLANDS
(D.C. Crim. Action No. 3:06-cv-00080-010)
District Judge: Honorable Curtis V. Gómez
_____

Argued May 2, 2017
_____

Before: GREENAWAY, JR., SHWARTZ and FUENTES, <u>Circuit Judges</u>

(Opinion Filed: September 8, 2017)
_____

OPINION[*]
_____

John R. Howes *[ARGUED]*
33 South Federal Highway
Ft. Lauderdale, FL 33301

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

*Counsel for Appellant*

Joycelyn Hewlett, Acting United States Attorney
Meredith J. Edwards *[ARGUED]*
Tasheika Hinson
Nelson L. Jones
Delia L. Smith
David W. White
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
St. Thomas, VI 00802

*Counsel for Appellee*

GREENAWAY, JR., Circuit Judge

Following a jury trial, Dorian Swan and six co-defendants were convicted of participating in a conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846 and contrary to 21 U.S.C. § 841(a)(1). The indictment stated that "[t]he conspirators transported wholesale quantities of cocaine . . . for subsequent distribution within the United States Virgin Islands and elsewhere." (Indictment ¶ II.A.)[1] Generally, the cocaine would travel through the airport on St. Thomas "for distribution within various states in the mainland United States." (*Id.* at I.)

On appeal, Swan raises three challenges to his conviction. He argues that insufficient evidence existed to support his conviction,[2] that all the evidence offered

---

[1] Although the indictment was not included as part of the joint appendix provided by the parties, the District Court Clerk's Office provided this Court with a copy of it. The indictment is part of the record on appeal, pursuant to Federal Rule of Appellate Procedure 10(a).

[2] With respect to the insufficiency of the evidence argument, Swan raises two related issues – that the evidence at trial varied from the offense charged in the

2

against him was admitted in violation of Federal Rule of Evidence 404(b), and that the prosecutor engaged in prosecutorial misconduct during closing argument. For the reasons set forth below, we find no errors were committed during his trial and will therefore affirm his judgment of conviction.

## I.    FACTS

According to the government, Swan, along with several other individuals, participated in a conspiracy to import cocaine from South America to Tortola in the British Virgin Islands ("BVI"). From there, the cocaine was transported by boat to the United States Virgin Islands ("USVI") and then smuggled through the airport in St. Thomas to various locations on the United States mainland. Each member played a different role in the conspiracy. We recount only the evidence relevant to Swan's participation.

At trial, James Springette testified that he was the head of a drug distribution ring that brought about 3,000 kilograms of cocaine from South America to the United States. According to Springette, his cousin, Elton Turnbull,[3] would arrange for the cocaine to be transported through the USVI's airport in St. Thomas to North Carolina.

He also explained that Gelean Mark[4] had connections allowing him to safely

---

indictment and that the evidence supported the existence of multiple conspiracies, in contravention of the tenets set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946).

[3] With respect to running the drug smuggling operation, Springette described his cousin as his "eyes and ears" (App. 181) and his "right-hand man" (App. 180).

[4] Throughout the trial, Mark was also referred to by his nicknames—Kerwin and Kirwin.

smuggle cocaine through the airport in St. Thomas. In 2000, Turnbull arranged to use Mark's connections at the St. Thomas airport to smuggle cocaine into North Carolina.

Turnbull explained that, due to some law enforcement seizures, the route to North Carolina became too "hot," requiring the conspiracy to change routes. Mark, however, had other routes, one of which "went through New York, and the other one ultimately ended up in the Philadelphia/Baltimore area." (App. 264–65.) In connection with the Philadelphia/Baltimore route, Turnbull explained that Mark told him couriers were not needed for that route because Warhead, whom Turnbull knew as Dorian Swan, would retrieve the drugs from the belly of the plane. According to Turnbull, he received drugs from Swan three to four times using this route. Turnbull's last delivery of ten kilograms from Swan occurred approximately a week before Turnbull's arrest on October 2, 2002.[5] Although he stated that he received the drugs from Swan, Turnbull testified on cross-examination that he never saw Swan with any drugs.

Glenson Isaac also implicated Swan in the drug conspiracy. Glenson Isaac explained that he had been imprisoned for drug dealing in North Carolina. Upon his release in November 2002, he was trying to get back into the drug trade. To that end, in March 2003, he visited Mark, a childhood friend, in St. Thomas. Glenson Isaac returned

---

[5] During cross-examination, Swan's counsel attempted to impeach Turnbull using testimony from a prior proceeding where Turnbull discussed Swan's St. Croix-to-Baltimore route, but never mentioned Swan's St. Thomas-to-Philadelphia/Baltimore route. On redirect, Turnbull confirmed that Swan had a drug route that went from St. Croix to Philadelphia, and that Turnbull would send couriers to Baltimore, where Swan lived, to retrieve the drugs.

to North Carolina where he received a call from Mark in April or May 2003. During that call, Mark told Glenson Isaac to go to New York to get drugs from Swan. Glenson Isaac went to New York where he met Swan in the Bronx and retrieved a bag containing one-half kilogram of cocaine from the back seat of the black BMW in which Swan was a passenger. In June 2003, Glenson Isaac again went to the Bronx where he retrieved two kilograms of cocaine from Swan.

On cross-examination, Glenson Isaac stated that the route Swan had from St. Croix to New York was Swan's own route, but then Glenson Isaac claimed the organization used that route in addition to the St. Thomas-to-North Carolina route.

Christopher Swaney, a convicted drug dealer from North Carolina, also testified about his interactions with Swan. In 2004, Swaney's friend and drug-dealing partner, Rodney Williamson, introduced Swaney to Swan at a dog fight in North Carolina. In their discussion, Swan told Swaney "that Glenson [Isaac] was not in control of nothing." (App. 945.) Rather, according to Swaney, Swan stated "that [he] and a partner of his from a feed mill was in control of things," particularly "the route of which the cocaine came to . . . the United States."[6] (App. 945.) Swan assured Swaney that he had a contact at the airport in St. Thomas who would switch the bags in order to facilitate the transportation to the mainland. Swan also explained to Swaney how the payments were returned to the Virgin Islands. After this encounter, Swaney purchased twenty kilograms

---

[6] Turnbull testified that he had helped Mark set up a feed shop, Finish Line Feed, on St. Thomas. Turnbull also stated that he himself sold feed in St. Thomas and Tortola.

of cocaine in New York from Swan. Another person delivered the drugs to Swaney, but Swan spoke to Swaney on the phone, guiding him to the location of the transaction. In an attempt to show that Swan had his own drug importation route, on cross-examination Swan's counsel elicited testimony from Swaney that, to his knowledge, Swan was not connected to the cocaine that he and his partner obtained from Glenson Isaac.

Kevon Isaac, Glenson Isaac's brother, testified that he and Swan knew each other since attending junior high school together in St. Thomas, and that they both lived in Baltimore from 1999 to 2003. While living in Baltimore, Kevon Isaac frequently would visit Swan at his apartment. On one occasion, he saw two women arrive with pieces of luggage and give the luggage to Swan in exchange for money. When the women left, Kevon Isaac helped Swan unpack the bags, which contained towels, pants, and a total of thirty-nine kilograms of cocaine. On two other occasions, Kevon Isaac saw couriers deliver suitcases containing drugs to Swan. Kevon Isaac also assisted Swan in packing money into suitcases for a courier to take to Mark in St. Thomas. Kevon Isaac confirmed that Swan owned a black BMW.

As part of his cooperation agreement, Kevon Isaac agreed to consensually record phone calls with other members of the conspiracy. One such call occurred on December 1, 2003 between him and Swan. At trial, Swan's counsel moved in limine to exclude this call. The District Court denied the motion and admitted that part of the call where Swan told Kevon Isaac that he "dropped two fowls, meaning dropping two kilos [of cocaine] . . . to [Kevon Isaac's] brother." (App. 1436.) More specifically, on the call, Swan told Kevon Isaac: "Some day ago I had couple little fowl and thing. Thrush end up with two

6

of them.  So I have to drive up there, get the cab from he and them F, you know what ah mean." (App. 1084.)  Kevon Isaac testified that "Thrush"[7] referred to Glenson Isaac and "cab" referred to "cabbage, the cash."  (App. 1435–36, 1469.)

Swan and his co-defendants were tried before a jury.  At the conclusion of the government's case, Swan moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and renewed this motion after the defense rested.  He also moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on a statement made by the prosecutor during closing argument.  The District Court denied all three motions.  The District Court entered final judgment based on the jury verdict and sentenced Swan to 210 months in prison and five years of supervised release.[8]  This timely appeal followed.

## II.    DISCUSSION[9]

### A. Sufficiency of the Evidence Claim

Swan raises several related arguments regarding the sufficiency of the evidence. These arguments involve three main issues, all centering on his theory that the evidence showed he ran his own drug routes between the USVI and the mainland.  First, Swan

---

[7] The record refers to other variations on the nickname Thrush, such as Trush, Trushy, and Thrushy.

[8] On November 3, 2015, the District Court reduced Swan's sentence to 168 months based on Amendment 782 to the Sentencing Guidelines.  He did not appeal this sentence.

[9] The District Court had jurisdiction pursuant to 18 U.S.C. § 3241.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

asserts that the evidence at trial simply established a "buyer-seller relationship," and that "[b]y itself, evidence of a buyer-seller relationship is insufficient to establish conspiracy." (Appellant's Br. at 11 (citing *United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986)).) Essentially, Swan contends that the government failed to establish any of the elements needed to prove a conspiracy—"(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal." (*Id.*) Instead, the evidence simply showed that he brought drugs to the mainland and occasionally sold those drugs to one or more members of the conspiracy. Second, Swan argues that "the testimony presented at trial did not link [him] to the conspiracy alleged in the indictment and argued at trial." (*Id.* at 12.) That is, he claims the evidence shows "the existence of a separate conspiracy," based on the "completely separate route out of St. Croix which ended in New York as opposed to the St. Thomas to North Carolina route run by the group charged in the Indictment." (*Id.* at 17.) As a result, "[t]he evidence . . . created a variance between what was alleged in the Indictment and what was proven at trial." (*Id.* at 19.) Third, Swan claims the indictment runs afoul of the proscription against "classic 'wheel' conspirac[ies]" set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946). (*Id.* at 18.)

In reviewing sufficiency of the evidence claims, "[w]e 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (second alteration in original)). We

8

"consider[] only the 'legal' question [of] 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"Under this particularly deferential standard, we 'must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury.'" *Caraballo-Rodriguez*, 726 F.3d at 430 (quoting *Brodie*, 403 F.3d at 133) (alterations in original). Moreover, "[w]e must sustain the jury's verdict 'if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision.'" *Id.* (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)). We "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

Sufficient evidence tied Swan to the charged conspiracy to support his conviction. Most significantly, the evidence showed that Swan participated in sales of cocaine involving other members of the conspiracy and that his participation was more than a simple buyer-seller relationship. For example, Glenson Isaac stated that, based on instructions from Mark, he obtained drugs from Swan. In addition, Turnbull testified that Swan was responsible for the Philadelphia/Baltimore route used by the conspiracy. Swaney recounted Swan's statement that he and his partner in a feed mill were in control of the cocaine coming from St. Thomas to the mainland.

Based on Turnbull's testimony, the jury could infer that Swan's partner was Mark. Considering this evidence, a jury could reasonably conclude that Swan acted with a unity of purpose with the other conspirators, in an effort to achieve the common goal of bringing drugs from the USVI to the mainland, and that there was an agreement to work together to achieve that goal. Therefore, the District Court did not err in concluding that sufficient evidence existed to support Swan's conviction.

Related to his argument that insufficient evidence supported his conviction, Swan posits that "the evidence demonstrates . . . the existence of a separate conspiracy," different from the one charged in the indictment. (Appellant's Br. 17.) He claims the existence of a variance. The crux of this argument rests on Swan's characterization of the indictment as charging a conspiracy that involved transportation of cocaine from St. Thomas to North Carolina, while his route moved drugs from St. Croix to New York. (*Id.*) The language of the indictment and the facts adduced at trial undermine this argument.

"There is a variance 'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *United States v. Daraio*, 445 F.3d 253, 261 (3d Cir. 2006) (quoting *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985) (alteration in original)). "[A] variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense." *Id.* at 262 (citing *United States v. Schurr*, 775 F.2d 549, 553–54 (3d Cir.1985)). Since we conclude no variance exists here, we need not consider whether Swan was surprised or otherwise prejudiced.

10

In its broadest terms, the indictment alleges that "[m]ost often, . . . drugs . . . [were] distributed . . .through the Cyril E. King Airport . . . for distribution within various states in the mainland United States." (Indictment ¶ I.)  As already discussed, based on Turnbull's testimony, a factfinder could conclude that Swan participated in smuggling drugs from St. Thomas to the Philadelphia/Baltimore area.  The indictment also specifically alleged that "[Swan], at the direction of [Gelean Mark], delivered cocaine to [Glenson Isaac] for distribution and sale on the streets of North Carolina." (Indictment ¶ II.L.)  Glenson Isaac's testimony supported this allegation. We can identify no variation between the conspiracy charged in the indictment and the evidence at trial.  The District Court did not err.  There was no variance.

Swan also argues that "the evidence demonstrated . . . a classic 'wheel' conspiracy" as described in *Kotteakos*.  (Appellant's Br. 18.)  In *Kotteakos*, only one conspiracy was charged in the indictment, but eight conspiracies were proved at trial, all involving different objects and different persons, except for one common participant. 328 U.S. at 758.  We have developed a three part test "to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989).

> First, we examine whether there was a common goal among the conspirators.  Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators.  Third, we examine the extent to which the participants overlap in the various dealings.

*Id.* (internal quotation marks and citations omitted).

Here, the first factor is satisfied since the common goal of moving cocaine from the USVI to the mainland for profit existed among the conspirators. As to the second factor, Turnbull's testimony about switching routes to keep the conspiracy viable demonstrates the need for continuous cooperation among the conspirators, including Swan. Without Swan's participation after the North Carolina route failed, the conspiracy would have ceased to exist. Finally, contrary to Swan's argument that the testimony showed "a classic wheel" conspiracy, the testimony actually showed an interconnected web of participants. The conspiracy here involved a complex series of interactions, all of which were required to ensure the continuity and success of the enterprise. Testimony showed that Swan dealt with Turnbull, Mark, Glenson Isaac, and Swaney. Swan did not simply interact with one central figure, but rather provided drugs to several participants and sent money back to Mark in the USVI. Since we find that all three factors of the *Kelly* test are satisfied, we conclude that sufficient evidence existed to prove the one conspiracy charged in the indictment.

### B. Admission of Evidence Claim

Swan argues that "the jury relied upon evidence of other bad acts offered by Turnbull, the Isaac brothers and Swaney," which "resulted in overwhelming prejudice to [him]." (Appellant's Br. at 20.) Swan contends that "the only evidence that the jury heard from the Government dealt with a conspiracy that [he] was not proven to be a member of, . . . [so] all of the evidence presented at trial was inadmissible against him and prejudicial, therefore requiring a reversal." (Appellant's Reply Br. at 3.)

12

"We review [a] District Court's decision to exclude or admit evidence for an abuse of discretion, but we have plenary review of the District Court's interpretation of the Federal Rules of Evidence." *United States v. Gilmore*, 553 F.3d 266, 271 (3d Cir. 2009) (citing *United States v. Mornan*, 413 F.3d 372, 377 (3d Cir. 2005)).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). "Rule 404(b) does not extend to evidence of acts which are intrinsic to the charged offense." *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) (citation omitted). "For our Court, acts are intrinsic when they directly prove the charged conspiracy." *Id.* at 320 (citing *United States v. Gibbs*, 190 F.3d 188, 217–18 (3d Cir. 1999)). "In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *Gibbs*, 190 F.3d at 217–18 (citation omitted). "Even if the evidence is 'extremely prejudicial to the defendant,' 'the court would have no discretion to exclude it because it is proof of the ultimate issue in the case.'" *United States v. Hoffecker*, 530 F.3d 137, 189 (3d Cir. 2008) (quoting *Gibbs*, 190 F.3d at 218).

Contrary to Swan's assertion, the evidence showed that Swan possessed and sold cocaine, as well as facilitated the transportation of cocaine from the USVI to the mainland as part of the conspiracy. For example, Swaney testified that Swan told him that he and his partner in a feed mill were in control of the transportation of drugs from the USVI to the mainland. Turnbull testified that Swan was responsible for the

Philadelphia/Baltimore route used by the conspiracy. Glenson Isaac testified that, at the direction of Mark, he received cocaine from a black BMW in which Swan was a passenger. Additionally, Kevon Isaac testified that he saw couriers deliver suitcases containing drugs to Swan and that he assisted Swan in packing money into suitcases for a courier to transport to St. Thomas. This evidence was intrinsic to the charged offense because it directly proved the conspiracy with which Swan was charged. Despite Swan's argument, "prior bad act evidence may be admitted for the purpose of demonstrating [a defendant's] knowledge of a conspiracy and relationship with one of its members." *United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002).

Swan further claims that reversal is warranted because "no cautionary or limiting instruction was read to the jury to protect [him] from the evidence's prejudicial effect." (Appellant's Br. at 21.) Since the evidence did not violate Rule 404(b), no such instruction was required. We conclude that the District Court did not abuse its discretion in admitting the evidence against Swan.

### C. Prosecutorial Misconduct Claim

As he did in his Rule 33 motion, Swan argues before us that "[t]he Government's comments during closing argument were improper and resulted in prejudice to [him]." (Appellant's Br. at 21.) Specifically, Swan contends that "the government commented on a recorded telephone conversation between [himself] and Kevon Isaac in an effort to link the alleged [sale of] two kilos [of cocaine] to the ones testified to by [Glenson] Isaac" by

14

mischaracterizing the time frame of the two events.[10] (*Id.* at 21–22.) The District Court denied Swan's motion for a mistrial based on these comments.

"It is fundamental that counsel 'may argue reasonable inferences from the evidence,' but may not 'misstate evidence.' A prosecutor's misstatement of the evidence can 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Fulton*, 837 F.3d 281, 306 (3d Cir. 2016) (quoting *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001) and *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)) (alteration in original) (internal citations omitted). "Our first task is to determine whether the prosecutor's comments were improper." *United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014) (citing *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir.1999)) (internal citations omitted). Then, "[i]n assessing the prejudice of the prosecutor's comments during closing argument, we must consider 'the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction.'" *Fulton*, 837 F.3d at 311-12 (quoting *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)).

---

[10] In his brief, Swan also complains that the jury instruction stating "that it would be sufficient if the evidence 'establishes beyond a reasonable doubt that the offense was committed on dates reasonably near the dates alleged'" was an insufficient curative instruction. (Appellant's Br. 22 (quoting App. 2279).) This argument is misguided. First, trial counsel never requested, and therefore the District Court never provided, a curative instruction. Not only did the quoted language not come from a curative instruction, but it had nothing to do with the recorded telephone call. Rather, the instruction was directed to the timing of the conduct charged in the indictment.

Here, the Government stated the following in rebuttal summation:

> Mr. [Glenson] Isaac now testifies that he received not only one shipment of a half a coke [sic] back in May or June of 2003, but that he also received a subsequent two keys from . . . Mr. Swan[.] . . . Do you recall Exhibit Number 44?[11] . . . Mr. Kevon Isaac, part of his cooperation, ladies and gentlemen, he's making consensual telephone calls to Mr. Swan. And in that particular call, Mr. Swan's own words, ladies and gentlemen, "He had two of them fowls that he had to take down to his bloodline Trush." . . . These are Mr. Swan's own words. I mean, it couldn't get any better if you tried. These are his words. Mr. [Glenson] Isaac is talking about receiving two kilograms of cocaine directly from Swan to get him back on his feet, as directed by Mark. And here we have this recording, where Mr. Swan is saying the same thing, that he gave Trush two keys. So ladies and gentlemen, the evidence speaks for itself. It is not a spin.

(App. 2263–64.) Swan asserts, however, that the sale of cocaine to Glenson Isaac is a separate event from his conversation with Kevon Isaac discussing "fowl" and "Thrush," because they occurred five or six months apart, and thus, the government's attempts to link the two was "misleading." (Appellant's Br. at 19, 21–22.)

The government's attempt to tie the telephone call to Glenson Isaac's testimony was not a misstatement of the evidence, but rather an attempt to draw a reasonable inference from the evidence. Both Glenson Isaac's testimony and the telephone conversation referred to a sale of two kilograms of cocaine from Swan to Glenson Isaac. Swan's reference to the sale occurring "some day ago" was not a specific time reference, and could reasonably be interpreted to mean "some time ago." As such, the government's comments during summation were not improper.

---

[11] Government Exhibit 44 was the recording of the call between Kevon Isaac and Swan on December 1, 2003.

Further, even if the comments were improper, Swan was not prejudiced. The reference to the call was only a small part of the government's closing. Out of approximately forty pages of argument about all of the defendants, the discussion of the call occupied only two paragraphs. In fact, the reference to the call was only one item of evidence the government cited in its discussion of Swan's part in the conspiracy. At the outset of the discussion of Swan's involvement, the government stated that "when it comes to Mr. Swan, the evidence is abundant." (App. 2261.) Following that statement, the government cited the testimony from Swaney and Glenson Isaac, as well as having previously reminded the jury of Turnbull's testimony involving Swan's role in importing drugs as part of the conspiracy. As already discussed with respect to the question of the sufficiency of the evidence, abundant evidence, separate and apart from the recorded call, implicated Swan in the conspiracy. In light of the other inculpatory evidence, we find it highly unlikely that the government's effort to draw a connection between the call and Glenson Isaac's testimony prejudiced Swan.

Considering that the government's comment was an attempt to draw a reasonable inference from the evidence, that there was extensive other evidence implicating Swan, and that trial counsel did not seek a curative instruction, we conclude that no error occurred with regard to the government's closing remarks.

## III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of conviction.